Exhibit 4

No *Shepard's* Signal™
As of: December 2, 2015 9:43 AM EST

# *Christian Dior Couture, S.A. v. Liu*

United States District Court for the Northern District of Illinois, Eastern Division

November 17, 2015, Decided; November 17, 2015, Filed

No. 15 C 6324

**Reporter**
2015 U.S. Dist. LEXIS 158225

CHRISTIAN DIOR COUTURE, S.A., Plaintiff, v. LEI LIU, et al., Defendants.

## Core Terms

consumers, personal jurisdiction, contacts, jewelry, products, infringed, seller, motion to dismiss, ship, purposefully, activities, courts, sales, sufficient evidence, fair play, trademarks, contends, internet, argues, reside

**Counsel:** **[*1]** For Christian Dior Couture, S.A., Plaintiff: Kevin W. Guynn, LEAD ATTORNEY, Amy Crout Ziegler, Jessica Lea Bloodgood, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL.

For Wholesale 925 Silver Jewelry Online Store, OMFENG, Defendants: Michael Joseph Parrent, LEAD ATTORNEY, Barrister Law, Chicago, IL.

For YWBeads Rhinestone & Beads Firm, Zaki Company 01, Zaki Company 02, Defendants: Cathleen S Huang, Richard A Ergo, LEAD ATTORNEYS, Bowles & Verna, Llp, Walnut Creek, CA.

**Judges:** Samuel Der-Yeghiayan, United States District Judge.

**Opinion by:** Samuel Der-Yeghiayan

## Opinion

### MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Omfeng (Omfeng) and Defendant Wholesale 925 Silvery Jewelry's (Silvery) motions to dismiss. For the reasons stated below, the motions to dismiss are denied.

### BACKGROUND

Plaintiff Christian Dior Couture, S.A. (Dior) allegedly engages in the manufacture, sale, and distribution of luxury merchandise worldwide. Dior's merchandise is allegedly labeled with federally-registered trademarks and sold to consumers by authorized retailers throughout the United States. Omfeng and Silvery allegedly operate as commercial internet stores on the website AliExpress.com **[*2]** (AliExpress) and sell products to buyers in the United States. The owners of Omfeng and Silvery allegedly reside in the People's Republic of China. Dior contends that until the court granted its request for injunctive relief, Defendants were offering counterfeit Dior products for sale on their internet stores on AliExpress. Dior's amended complaint includes claims brought pursuant to *15 U.S.C. 1501, et seq.* of the Lanham Act (Lanham Act) for trademark infringement and counterfeiting (Count I), false designation of origin claims (Count II), cybersquatting claims (Count III), and claims brought pursuant to the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS § 510, et seq.* (Count IV). Dior filed a motion for a temporary restraining order (TRO) to stop the alleged counterfeit sales, which the court granted. At a subsequent preliminary injunction hearing, Dior presented evidence that Defendants targeted their internet stores towards consumers in the United States, including Illinois. Defendants, at that time, argued that the court lacked personal jurisdiction over them since they were located in China and had no sales in Illinois. The court found that it had personal jurisdiction over the Defendants since Dior had sufficiently **[*3]** established, at that stage in the proceedings, that Defendants were directly targeting their business activities toward consumers in the United States, including Illinois. The court then entered the preliminary injunction order. Defendants now move to dismiss the instant action pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, again arguing that this court lacks personal jurisdiction over them.

### LEGAL STANDARD

Pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, a party can move to dismiss claims for lack of personal

2015 U.S. Dist. LEXIS 158225, *3

jurisdiction. *Fed. R. Civ. P. 12(b)(2)*. The plaintiff bears the burden of demonstrating the existence of personal jurisdiction. *Steel Warehouse of Wisconsin, Inc. v. Leach, 154 F.3d 712, 715 (7th Cir. 1998)*; *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997)*. When the court adjudicates a motion to dismiss brought pursuant to *Rule 12(b)(2)* based on written materials submitted to the court, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*(internal quotations omitted). In determining whether the plaintiff has met his burden, the "court accepts all well-pleaded allegations in the complaint as true." *Hyatt Int'l. Corp. v. Coco, 302 F.3d 707, 712-13 (7th Cir. 2002)*. In addition, "the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue Research Found., 338 F.3d at 782*; *see also Leong v. SAP America, Inc., 901 F.Supp. 2d 1058, 1061-62 (N.D. Ill. 2012)*(explaining that "when the defendant challenges by declaration a fact alleged in the plaintiff's complaint, the plaintiff has an obligation [*4] to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction").

## DISCUSSION

Defendants contend that this court lacks personal jurisdiction over them and that all claims brought against them should thus be dismissed. Personal jurisdiction involves consideration of both federal and state law. *Illinois v. Hemi Group, LLC, 622 F.3d 754, 756-57 (7th Cir. 2010)*(stating that the Court was "still unable to discern an operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction")(internal quotations omitted)(quoting *Hyatt Int'l Corp., 302 F.3d at 715*). A court has general personal jurisdiction over a defendant if the defendant has "continuous and systematic" contacts with the forum that are "sufficiently extensive and pervasive to approximate physical presence." *Tamburo v. Dworkin, 601 F.3d 693, 701 (7th Cir. 2010)*. The court has specific personal jurisdiction over a defendant if "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id. at 702* (citation omitted). Dior argues that Defendants are subject to the jurisdiction of this court based on specific personal [*5] jurisdiction. (Resp. O 7-10; Resp. S 6-10).

## I. Contacts with Illinois

Defendants argue that they lack sufficient contacts with Illinois to be subject to personal jurisdiction.

## A. Omfeng

Omfeng contends that it is not subject to personal jurisdiction, arguing that it did not have any intentional contacts with Illinois consumers. (O Mot. 2-6); (O Reply 1-2). Omfeng claims that it is not based in Illinois and its owners and employees reside in China. (O Mot 1-3). Omfeng argues that its owner, FenFen Zeng, is a citizen and resident of the People's Republic of China and has never visited Illinois. However, the record shows that Omfeng regularly sells to consumers in the United States and recently offered to sell jewelry to an Illinois consumer. (Resp. O 4-5). Omfeng's Illinois offer occurred on AliExpress this year and involved jewelry that infringed on Dior's product line. (Resp. O 4-5). The Seventh Circuit has also found that when a company indicates to consumers an ability to ship to a certain state, that such an offer to consumers is pertinent in assessing whether that company is subject to personal jurisdiction. *Illinois v. Hemi Grp. LLC, 622 F.3d 754, 758 (7th Cir. 2010)*. The record shows that Omfeng operates on AliExpress, which prices products [*6] in U.S. dollars and the consumers that purchase Omfeng's products are informed that Omfeng will ship the products to the United States, including Illinois. Dior has shown that Omfeng sells products to consumers in the United States and has offered to sell and ship jewelry to Illinois. By both operating on AliExpress and actually offering to sell a product to an Illinois consumer, Omfeng has intentionally directed its activities at Illinois and purposefully availed itself of the privilege of conducting business in Illinois. *Dworkin, 601 F.3d at 701*. Further, the alleged injury in this case arises directly out of Omfeng's offer to sell jewelry to an Illinois consumer. *Id.* Omfeng also argues that the jewelry it offered for sale in Illinois was never actually sold to the Illinois buyer in question. (O Reply 1-4). However, Omfeng has pointed to no controlling precedent that would require a completed sale in order to be subject to personal jurisdiction. If Omfeng made efforts to extend offers to Illinois consumers, Omfeng purposefully availed itself of the privilege of conducting business in Illinois, whether or not the deals were finalized. In addition, whether the jewelry in question was actually sold is not [*7] pertinent to Omfeng's liability since a mere offer to sell infringed merchandise is sufficient to establish liability under the Lanham Act. *15 U.S.C. § 1114*.

Omfeng further argues that the jewelry in question did not infringe on Dior's product line. This court was provided with evidence at the TRO and preliminary injunction stage. In evaluating the merits of Dior's claims, this court found sufficient evidence of infringing conduct by Omfeng. Dior has also provided additional evidence in response to the

instant motion. Dior is not required to prove its case at this juncture. *Purdue Research Found., 338 F.3d at 782*. Although Omfeng contends that the jewelry in question is not infringing, there is no indication that Omfeng has made the actual product in question available to Dior. Nor has Dior yet been given the opportunity to conduct discovery in this case. Dior has provided sufficient evidence to show that the product in question was an infringing product. Therefore, Dior has presented sufficient evidence to establish a *prima facie* case as to Omfeng's contacts with Illinois to show that it is subject to personal jurisdiction.

### B. Silvery

Silvery contends that it is not subject to personal jurisdiction, arguing that it did not purposefully direct [**8**] its activities at residents of Illinois. (S Mot. 4); (S Reply 1-2). Silvery argues personal jurisdiction cannot exist since the offer was "made from within China. . . ." (S Mot. 4); (S Reply 4-5). However, Silvery points to no controlling precedent that would insulate a seller from being subject to personal jurisdiction simply because the seller was physically located in another jurisdiction. Courts have found, for example, that reaching out via telephone or mail to a state is sufficient to obtain minimum contacts with a state. *See Heritage House Restaurants, Inc. v. Cont'l Funding Grp., Inc., 906 F.2d 276, 281 (7th Cir. 1990)*(stating that "[t]he physical presence of a defendant in Illinois during the transaction is not necessary to obtain jurisdiction under the long-arm statute" and that "[w]here a relationship is naturally based on telephone and mail contacts, these contacts can justify jurisdiction over a defendant").

Silvery acknowledges that its owners are YunBo Yue, GaoWen Wu and Qi Huang, and that they use aliases such as Shuai Liu and Tony Lee. (S Mot. 2). Although Silvery is vague as to the citizenship of all such persons, Silvery does argue that GaoWen Wu is a citizen and resident of the People's Republic of China and has never visited Illinois. The record shows that Silvery recently [**9**] offered to sell jewelry to an Illinois consumer, that Silvery's Illinois offer occurred on AliExpress this year, and that the offer involved jewelry that infringed on Dior's product line. (S Resp. 4-5). Silvery operates on AliExpress, which prices products in U.S. dollars. Consumers who purchase Silvery's products are informed that Silvery will ship the products to the United States, including Illinois. By operating on AliExpress and selling and offering to sell products to Illinois consumers, Silvery has intentionally directed its activities at Illinois and purposefully availed itself of the privilege of conducting business in Illinois. *Dworkin, 601 F.3d at 701*. Further, the alleged injury in this case arises directly out of Silvery's

offer to sell jewelry to an Illinois consumer. Therefore, Dior has presented sufficient evidence to establish a *prima facie* case as to Silvery's contacts with Illinois to show that it is subject to personal jurisdiction.

### II. Fair Play

Defendants argue that they are merely sellers in a global market place and that consumers who choose to reach out to them for products should understand that they will have no legal recourse in the consumers' home forums. Defendants also argue that [**10**] companies such as Dior who are bringing Lanham Act claims such as this should not be able bring suit in United States courts.

In the instant action, it is true that Dior is not a company based in the United States. The Supreme Court has explained, however, that "[t]he Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 198, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)*(stating that '[b]ecause trademarks desirably promote competition and the maintenance of product quality, Congress determined that sound public policy requires that trademarks should receive nationally the greatest protection that can be given them"). Dior, in bringing the Lanham Act claims, is pursuing the interests of United States consumers and acting in accordance with public policy of the United States and the will of Congress.

The court notes that Defendants rely heavily upon the Seventh Circuit decision in *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796 (7th Cir. 2014)*. In that case, the Seventh Circuit cautioned that merely shipping an item to a state does not automatically create personal jurisdiction, explaining that, there is not a "de facto universal jurisdiction" simply because [**11**] a seller operates a website and ships an item to a state. *Id. at 801-02*. The Seventh Circuit further explained that merely operating an interactive website that is accessed by a consumer within a state may not be sufficient to form minimum contacts. *Id. at 802-03; see also Monster Energy Co. v. Wensheng, 2015 U.S. Dist. LEXIS 132283, 2015 WL 5732050, at *4 (N.D. Ill. 2015)*(holding that "[d]isplaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale"); *Coach, Inc. v. Di Da Imp. & Exp., Inc., 2015 U.S. Dist. LEXIS 22222, 2015 WL 832410, at *2 (N.D. Ill. 2015)*(indicating that personal jurisdiction existed based upon internet sales). Although Dior has offered

2015 U.S. Dist. LEXIS 158225, *11

sufficient evidence at this juncture to establish the necessary contacts with Illinois by Defendants, there is one important distinction between the instant action and *Advanced*. In *Advanced*, the seller was located in California. *Id. at 798*. Thus, although the seller may not have been found to be subject to suit in all fifty states, the seller presumably would have been subject to suit in California. Any consumer or aggrieved seller could at least presumably seek legal relief in a federal court in California.

In this case, Defendants are not physically present and operating in the United States. Apparently, Defendants indicate that injured parties have one option, that is, that they can go [*12] to China and try and work their way through the Chinese legal system and try and get relief. Defendants indicate that "jurisdiction would be appropriate outside of the United States only." (S Reply 14). Defendants do not suggest any alternative forum in the United States, or acknowledge that any of their contacts would subject them to personal jurisdiction in the United States in states other than Illinois. Defendants also argue that a transfer of this case to China will not be possible, contending that "this court does not have the capability of transferring a case internationally." (S Reply 14). If the court accepts Defendants' arguments, the United States consumers, and parties like Dior, who claim to be harmed by Defendants' acts, will have no access to the federal courts in the United States, and the protections of the Lanham Act, will not be available. The record shows that Defendants have significant sales within the United States. The Supreme Court has explained that a court can exercise personal jurisdiction over a defendant if that defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play [*13] and substantial justice." *Philos Techs., Inc. v. Philos & D, Inc., 802 F.3d 905, 912-13 (7th Cir. 2015)*(quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* and *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940))*. Requiring Defendants such as this who reap significant profits from sales to consumers such as those in Illinois, to come to court and defend their actions certainly does not offend traditional notions of fair play and substantial justice, particularly as in this case where specific contacts have allegedly harmed Illinois consumers. Fair play means that if you decide to sell to consumers in the United States you must come to the United States and stand accountable for conduct relating to such sales. Dior has shown that Defendants have had more than minimum contacts with Illinois, and also contacts with others in the United States as well. *See, e.g.*, *Fed. R. Civ. P. 4* (stating that "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws"). Fair play means that if a company accuses you of profiting by illegally using a mark that you do not own, that you appear and answer that accusation. The Seventh Circuit has also explained that [*14] "[d]ue process requires that potential defendants should have some control over and certainly should not be surprised by the jurisdictional consequences of their actions." *Hemi Grp. LLC, 622 F.3d at 758* (internal quotations omitted)(quoting *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1277 (7th Cir. 1997))*. In this instance, as the Defendants continued to sell to United States consumers and the United States dollars continued to flow back to Defendants, they should not have been surprised to learn that they are subject to the jurisdiction of United States courts in regard to their transactions. It may be a global market place as Defendants claim, but they cannot insulate themselves from any harm that they cause simply by locating themselves within the borders of China or any other country outside the United States. Dior has shown that Defendants attempted to sell a product to Illinois consumers and ship at least one product to Illinois. In fairness, Defendants should be required to defend themselves in a court in Illinois.

The court is not making any determinations as to the ultimate merits of Dior's claims. The court is merely holding that Defendants must come to this court and defend themselves. They will be provided with all of the protections accorded to every defendant in United [*15] States courts and will be given an opportunity to prepare a complete defense to all the claims alleged against them in this action. Based on the above, Defendants' motions to dismiss are denied.

## CONCLUSION

Based on the foregoing analysis, Defendants' motions to dismiss are denied.

/s/ Samuel Der-Yeghiayan

Samuel Der-Yeghiayan

United States District Court Judge

Dated: November 17, 2015

Westlaw.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

H

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
CHARTER NATIONAL BANK AND TRUST,
Plaintiff,
v.
CHARTER ONE FINANCIAL, INC., Charter One
Bank, FSB and St. Paul Federal Bank for Savings,
Defendants.

No. 01 C 0905.
May 15, 2001.

*MEMORANDUM, OPINION AND ORDER*
ANDERSEN, J.

**\*1** This case is before the Court on the Motion
for a Temporary Restraining Order brought by
plaintiff Charter National Bank and Trust. Charter
National seeks to restrain Charter One Financial,
Inc ., Charter One Bank, FSB and St. Paul Federal
Bank for Savings from operating any location in the
Chicago metropolitan area using the mark
"charter." For the following reasons, Charter Na-
tional's motion is granted in part and denied in part.

*ALLEGED FACTS*

Northwest Bankcorp acquired a bank in Han-
over Park and renamed it Charter Bank and Trust of
Illinois on October 1, 1987. In 1993, two more loc-
ations were added, one in Schaumburg and one in
Hoffman Estates. Charter Bank and Trust of Illinois
changed its name to Charter Bank and Trust, N.A.
and then to Charter National Bank and Trust
("Charter National"). Since 1987, the entity now
known as Charter National has continuously oper-
ated the Hanover Park facility and has displayed a
large sign out front with the words "Charter Bank".
Since 1993, the Hoffman Estates and Schaumburg
branches have displayed large signs with the words
"Charter Bank".

Charter One did not do business in the State of

Illinois until it acquired St. Paul Federal Bank for
Savings in 1999. Until January of 2001 it operated
St. Paul's fifty-eight Chicago metropolitan locations
under the trade name and trademark "St. Paul". In
January of 2001, St. Paul announced that it was
changing its name to Charter One Bank. On Febru-
ary 6, 2001, counsel for Charter National faxed a
letter to Charter One informing Charter One of its
contention that Charter National was the senior
common law user in Chicago and that the name
change was already causing customer confusion.

After Charter One did not stop converting
branches from the mark "St. Paul" to "Charter
One", Charter National filed the instant lawsuit.
The issues have been extensively briefed and we
have conducted an evidentiary hearing. While this
court has reviewed the motion for a temporary re-
straining order, defendants have agreed to refrain
from displaying the name "Charter One" in the geo-
graphic area surrounding Charter National's three
branches.

*DISCUSSION*

The purpose of preliminary injunctive relief is
"to minimize the hardship to the parties pending the
ultimate resolution of the lawsuit." *Platinum Home
Mortgage Corp. v. Platinum Financial Group Inc.,*
149 F.3d 722, 726 (7th Cir.1998). The standards for
a temporary restraining order and the standards for
a preliminary injunction are identical. *Atkins v. Ar-
son Pirie Scott & Co., Inc.,* 1999 WL 1249342 at *1
(N.D.Ill.Dec. 13, 1999). Therefore, a TRO is war-
ranted if the party seeking the injunction can make
a threshold showing that: (1) the case has a reason-
able likelihood of success on the merits; (2) no ad-
equate remedy at law exists; (3) it will suffer irre-
parable harm if the injunction is not granted; (4) the
balance of hardships is in favor of the moving
party; and (5) the preliminary injunction will not
harm the public interest. *Rust Environment & Infra-
structure, Inc. v. Teunissen,* 131 F.3d 1210, 1213
(7th Cir.1997).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)

**(Cite as: 2001 WL 527404 (N.D.Ill.))**

**\*2** "Trademark law aims to aid consumers in identifying the source of goods by allowing producers the exclusive right to particular identifying words or symbols which they may attach to their products as a designator of source." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

Charter National has shown a reasonable likelihood of success on the merits. In order to show a reasonable likelihood of success on the merits in a trademark infringement claim, the plaintiff must demonstrate: (1) the validity of its trademark and (2) the infringement of that mark. *Echo Travel, Inc. v. Travel Associates, Inc.,* 870 F.2d 1264, 1266 (7th Cir.1989). The validity of a mark is established by showing that a "word, term, name, symbol or device" is entitled to protection because that mark specifically identifies and distinguished one company's goods from those of its competitors. *Platinum,* 149 F.3d at 726. Charter National is the senior user of the mark in the Chicago metropolitan area. Although Charter One has registered its mark at the U.S. Patent and Trademark Office, that trademark only allows it to use its mark if no other senior user, who has been continuously using the mark, has priority. 15 U.S.C. § 1065. A trademark application is always subject to previously established common law rights of another party. *The Money Store v. Harriscorp Fin.,* 689 F.2d 666, 672 (7.th Cir1982). Therefore, if "Charter National Bank" is protectable under common law trademark law, Charter National has a reasonable likelihood of success on the merits.

Charter National contends that its mark is protectable because the term "charter" is more than a generic term, such as bank. Charter One argues that the mark is not protectable because it simply signifies that the bank has been certified, or chartered, by the state or federal government. We disagree. "Charter National Bank" is entitled to protection.

The determination of whether a party has established a protectable right in a trademark is made on a case by case basis, considering the totality of the circumstances. *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9 th Cir.1979). A party may acquire a protectable right simply through the use of the mark in connection with goods or services. *Zazu Designs v. L'Oreal,* S.A., 979 F.2d 499, 503 (7 th Cir.1992). We find that Charter National has shown a reasonable likelihood of success in its claim to have acquired a protectable right in "Charter National" through its evidentiary submissions of advertising brochures, ads, and pictures of signs, as well as its evidence of actual confusion. Later in the course of this case, Charter National will have to present more substantial evidence of confusion, but at this point the evidence it has presented is sufficient to convince this court that there is a reasonable likelihood of success in showing that its name has acquired a secondary meaning in the minds of customers and, therefore, deserves protection.

**\*3** In a trademark infringement case, damages are by "their very nature irreparable and not susceptible of adequate measurement for remedy at law." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7 th Cir.1988). Charter National has shown a reasonable likelihood of success on the merits because of customer confusion and frustration. Furthermore, the fact that it is virtually impossible to calculate the financial impact of these damages shows that there is no adequate remedy at law.

Balancing of the hardships and the public's interest presents the closest question here. Defendants operate over seventy locations in the entire Chicago metropolitan region and forcing them to cover all of their signs on all banks is a hardship. However, they knew of this potential conflict before they changed the names of their banking operations from St. Paul to Charter One.

We have considered different geographical parameters for a temporary restraining order. Eighty percent of Charter National's deposit customers are clustered within three miles around its branches. Therefore, we have entertained the option

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)
**(Cite as: 2001 WL 527404 (N.D.Ill.))**

of structuring a TRO to include that geographic area. In response, Charter National argued that it makes a profit only by virtue of the loans that it makes and, since its loan customers live in a much broader geographic area than its deposit customers, its damages will not by redressed unless we totally enjoin Charter One from any use of the mark "charter" in the entire Chicago metropolitan area. In the event that we determine that a preliminary injunction is justified, we might require that Charter One stop using the mark "charter" in the entire Chicago metropolitan area. However, given the balancing of the hardships at this stage in the litigation and the inconvenience to Charter One's hundreds of thousands of customers in the Chicago area, we will not order Charter One to stop using the mark "charter" in the entire metropolitan area.

We have fashioned a remedy which balances the public interests and the hardships, but still recognizes Charter National's likelihood of succeeding on the ultimate merits. We will restrain Charter One entities from operating any type of bank facility using the word "charter" on any outdoor sign within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, we will enjoin Charter One from opening any new locations, in the above geographic area, which use the mark "charter" in any way or is identified as "Charter One". This solution balances the strength of Charter National's mark in a smaller geographic area against the hardship of Charter One changing all of the signs on all of its facilities in the Chicago area on a temporary basis.

### CONCLUSION

Charter National Bank & Trust's motion for a temporary restraining order is granted in part and denied in part. Charter One Financial, Inc., Charter One Bank, FSB and St. Paul Federal Bank for Savings are enjoined from operating any type of bank facility using the word "charter" on any outdoor signs within the geographic area between Lake Cook Road, on the north, I 290/I355/Illinois 53, on the east, North Avenue, on the south, and the Fox River, on the west. Furthermore, Charter One is enjoined from opening any new locations in that geographic area that use the mark "charter" in any way or is identified as "Charter One". Charter National's request for a temporary restraining order prohibiting Charter One from using the mark "charter" throughout the entire Chicago metropolitan area is denied.

**\*4** It is so ordered.

N.D.Ill.,2001.
Charter National Bank and Trust v. Charter One Financial, Inc.
Not Reported in F.Supp.2d, 2001 WL 527404 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Positive
As of: June 26, 2015 5:58 PM EDT

## *Packaging Supplies, Inc. v. Harley-Davidson, Motor Co.*

United States District Court for the Northern District of Illinois, Eastern Division

May 12, 2011, Decided; May 12, 2011, Filed

Case No.: 08-cv-400

**Reporter**

2011 U.S. Dist. LEXIS 50897; 100 U.S.P.Q.2D (BNA) 1348; 2011-1 Trade Cas. (CCH) P77,473; 2011 WL 1811446

PACKAGING SUPPLIES, INC., Plaintiff, v. HARLEY-DAVIDSON, INC., and HARLEY-DAVIDSON MOTOR COMPANY, INC., Defendants.HARLEY-DAVISON, INC.; HARLEY-DAVIDSON MOTOR COMPANY, INC.; and H-D MICHIGAN, LLC, Counterclaim Plaintiffs, v. PACKAGING SUPPLIES, INC., Counterclaim Defendant.

**Subsequent History:** Later proceeding at *Packaging Supplies v. Harley-Davidson, Inc., 2011 U.S. Dist. LEXIS 127681 (N.D. Ill., Nov. 4, 2011)*

**Prior History:** *Packaging Supplies, Inc. v. Harley-Davidson, Inc., 2009 U.S. Dist. LEXIS 25732 (N.D. Ill., Mar. 30, 2009)*

**Counsel:** [*1] For Packaging Supplies, Inc., an Arizona corporation, Plaintiff, Counter Defendant: Alan F. Block, Jessica A. Jeffries, Block & Landsman, Chicago, IL.

For Harley-Davidson, Inc., a Wisconsin corporation, Defendant: Barbara O. Bruckmann, PRO HAC VICE, Charles M. Malaise, James G Kress, Howrey LLP, Washington, DC; Romeo S. Quinto, Morgan Lewis & Bockius LLP, Chicago, IL; Thomas Mark Williams, Winston & Strawn LLP, Chicago, IL.

For Harley-Davidson Motor Company, Inc., Defendant: Thomas Mark Williams, Winston & Strawn LLP, Chicago, IL.

For H-D Michigan, LLC, Harley-Davidson Motor Company, Inc., Counter Claimants: Thomas Mark Williams, Winston & Strawn LLP, Chicago, IL.

For Harley-Davidson, Inc., a Wisconsin corporation, Counter Claimant: Barbara O. Bruckmann, Charles M. Malaise, James G Kress, Howrey LLP, Washington, DC; Romeo S. Quinto, Morgan Lewis & Bockius LLP, Chicago, IL; Thomas Mark Williams, Winston & Strawn LLP, Chicago, IL.

**Judges:** Robert M. Dow, Jr., United States District Judge.

**Opinion by:** Robert M. Dow, Jr.

## Opinion

[**1349] **MEMORANDUM OPINION AND ORDER**

Before the Court are two unopposed motions for summary judgment filed by the Harley-Davidson parties. Defendants move for summary judgment on all of the counts of Plaintiff's [*2] complaint [71]. Counterclaim Plaintiffs move for partial summary judgment on Counts I, II, V, and VII of their counterclaim (the counts that allege trademark infringement and unfair competition) [73]. For the following reasons, both of the pending motions [71, 73] are granted.

2011 U.S. Dist. LEXIS 50897, *2; 100 U.S.P.Q.2D (BNA) 1348, **1349

## I. Background

Plaintiff and Counterclaim Defendant Packaging Supplies, Inc. ("PSI") is an Arizona corporation with its principal place of business in Scottsdale, Arizona. Defendant and Counterclaim Plaintiff Harley-Davidson, Inc. is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. Defendant and Counterclaim Plaintiff Harley-Davidson Motor Company, Inc. is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin, and is responsible for the sale of Harley-Davidson motorcycles, parts and accessories, and general merchandise to Harley-Davidson dealers. Counterclaim Plaintiff H-D Michigan, LLC is a Michigan corporation with its principal place of business in Ann Arbor, Michigan. H-D Michigan is the owner of the Harley-Davidson trademark rights asserted in this action. Harley-Davidson, Inc. is the ultimate parent corporation of its subsidiaries, H-D Michigan, [*3] LLC and Harley-Davidson Motor Company, Inc. Collectively, the Court will refer to Defendants and Counterclaim Plaintiffs as "Harley-Davidson." [1]

Plaintiff commenced this action on January 17, 2008. On March 30, 2009, the Court denied Harley-Davidson's motion to dismiss the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* [32]. On April 14, 2009, Harley-Davidson answered Plaintiff's complaint and asserted affirmative defenses and counterclaims [35]. The parties conducted full fact discovery. On August 30, 2010, Harley-Davidson filed its motions for summary judgment along with a consolidated statement of undisputed facts pursuant to Local Rule 56.1. After receiving input from [*4] the parties regarding their preferred briefing schedule, the Court set a deadline of October 13, 2010 for Plaintiff's responses and November 3, 2010 for Harley-Davidson's replies [79]. As of the date of this order, Plaintiff has filed no papers whatsoever in response to Harley-Davidson's motions. Nor has Plaintiff requested an extension or made any filing at all in this case. Because Plaintiff has failed to controvert Harley-Davidson's statement of facts [75], the Court deems those facts admitted so far as they are supported by admissible record evidence. [2] See Local Rule ("L.R.") 56.1(b)(3)(C); *Bell, Boyd, & Lloyd v. Tapy, 896 F.2d 1101, 1102 (7th Cir. 1990)*.

## A. Harley-Davidson's Trademarks

Harley-Davidson began selling motorcycles in the United States in 1903 and has since become an iconic brand that is recognized worldwide. H-D Michigan, LLC is the owner of a number of Harley-Davidson's federal trademarks and service marks, including the word mark "HARLEY-DAVIDSON" the "Bar & Shield" logo and the "MotorClothes" logo.

[**1350]

---

[1]  The Court has both federal question and diversity jurisdiction over this lawsuit. The Court has federal question jurisdiction over PSI's antitrust claim pursuant to 15 U.S.C. §15(a) and *28 U.S.C. § 1331*. The Court has jurisdiction over Harley-Davidson's Counterclaims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338(a) and (b). Further, because the parties are citizens of different states and the matter in controversy exceeds $75,000, the Court also has jurisdiction over this matter under *28 U.S.C. § 1332*.

[2]  L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000)*. Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g., Malec, 191 F.R.D. at 583*. L.R. 56.1(b)(3)(C) provides that "[a]ll material facts set forth in the statement required of the moving party [*5] will be deemed to be admitted unless controverted by the statement of the opposing party." The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g., Koszola v. Bd. of Educ. of the City of Chicago, 385 F.3d 1104, 1109 (7th Cir. 2004)*; *Curran v. Kwon, 153 F.3d 481, 486 (7th Cir. 1998)* (citing *Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1317 (7th Cir. 1995)* (collecting cases)).

2011 U.S. Dist. LEXIS 50897, *4; 100 U.S.P.Q.2D (BNA) 1348, **1350





The registrations for these marks remain in full force and effect and the United States Patent and Trademark Office ("USPTO") has accepted and acknowledged *Section 15* incontestability affidavits for all of the relevant registrations. The Harley-Davidson name mark and logos are collectively referred to herein as the "H-D Marks."

The H-D Marks are widely recognized as among **[*6]** the world's most famous trademarks. By virtue of Harley-Davidson's extensive use and promotion of the H-D Marks, consumers have come to recognize Harley-Davidson as the source or sponsor of a wide range of quality products marketed under the H-D Marks. Harley-Davidson has invested substantial time, effort and money in advertising and promoting the H-D Marks for decades, exposing the Marks to millions of people. Between 2004 and 2008 alone, Harley-Davidson spent more than $344 million on advertising, promoting, and marketing products and services under the H-D Marks, with the majority of that advertising taking place in the United States. Between 2004 and 2008 alone, Harley-Davidson sold nearly 1.25 million motorcycles in the U.S. generating over $16.3 billion in sales. During that same period, Harley-Davidson sold more than $4.1 billion of

motorcycle parts and accessories worldwide and more than $1.3 billion of apparel and collectibles worldwide, the majority of which sales took place in the United States. In addition, for the past five years, Harley-Davidson has received substantial royalty revenues from licensing its trademarks, with the majority of these revenues coming from the **[*7]** United States.

The federal trademark registrations for the H-D Marks cover use of the Marks on a wide variety of Harley-Davidson products including, for example, motorcycle accessories, helmets, jackets, hats, t-shirts and dozens of other items in addition to motorcycles. Additionally, Harley-Davidson has used the H-D Marks on merchandise bags supplied to its dealers since at least 1987, and has sold more than forty million merchandise bags bearing H-D Marks to its dealers since then. Harley-Davidson markets and sells its merchandise bags bearing the H-D Marks to its dealers through its MotorClothes merchandise catalogs.

## B. PSI's Use of H-D Marks

PSI's business is plastic merchandise bags. These bags are not sold in stores; rather they are used by consumers for carrying away their purchases after transactions with PSI's clients. The bags are custom printed, and since 1964 PSI has been selling them to retailers, manufacturers and franchise operators throughout the United States. Beginning around 2002, numerous Harley-Davidson motorcycle dealerships (125 out of 679) were among PSI's clients. These dealerships are independently owned and licensed, and the bags that PSI made were customized **[*8]** for each dealer-client.

PSI used one or more of the H-D Marks on every (or nearly every) merchandise bag sold **[**1351]** to a Harley-Davidson dealer. PSI

Case: 1:21-cv-05863 Document #: 15-4 Filed: 11/04/21 Page 12 of 64 PageID #:355

Page 4 of 11

2011 U.S. Dist. LEXIS 50897, *8; 100 U.S.P.Q.2D (BNA) 1348, **1351

admits that its supply of merchandise bags to Harley-Davidson dealers depends on its use of H-D Marks. PSI has never been licensed by Harley-Davidson to use the H-D Marks and never sought Harley-Davidson's permission to use the H-D Marks. [3]

PSI has sold its bags to Harley-Davidson dealers in competition with Harley-Davidson and has displaced it as a supplier of merchandise bags at certain dealerships. PSI also used the H-D Marks in promotional materials that PSI used to promote its business. Starting in approximately 2004, PSI promoted its business by disseminating to prospective [*9] customers fliers that depicted merchandise bags produced for Harley-Davidson dealers and incorporating H-D Marks. During that period, PSI sent approximately 1,000 fliers each year to Harley-Davidson and other motor sports dealers. For those Harley-Davidson dealers that expressed an interest in PSI's merchandise bags, PSI routinely sent sample packs of bags produced for other Harley-Davidson dealers that incorporated H-D Marks. None of the PSI promotional materials makes any reference to whether PSI was authorized to use the H-D Marks.

Sometime in 2005, PSI received a telephone call from a former Harley-Davidson "trademark enforcement" employee concerning its merchandise bags. Following that call, PSI wrote to the Harley-Davidson trademark enforcement employee on November 2, 2005, regarding its merchandise bag program, explaining, *inter alia*, that PSI "would never intentionally violate a federal trademark."

In 2007, Harley-Davidson received an inquiry from a Harley-Davidson dealer regarding whether PSI was an authorized supplier that was permitted to use the H-D Marks on its merchandise bags. In June 2007, Harley-Davidson posted a notice on its dealer intranet advising Harley-Davidson [*10] dealers that PSI was not authorized to use H-D Marks on merchandise bags, that PSI had received a "cease and desist notice," and that "all merchandise bags bearing Harley-Davidson's name and/or logo must be obtained through" Harley-Davidson. See Ex. A to Cmplt., incorporating full text of Notice).

PSI received a copy of the Harley-Davidson Notice in approximately June 2007, and became aware that Harley-Davidson objected to PSI's use of H-D Marks on merchandise bags. Since that time, PSI received additional notice of Harley-Davidson's position regarding PSI's infringement of its trademarks through the counterclaims in this litigation, and otherwise. However, following receipt of the Harley-Davidson June 2007 Notice, PSI did not change its business operations concerning the sale to Harley-Davidson dealers of merchandise bags bearing H-D Marks. PSI also continued to represent to Harley-Davidson dealers that PSI did not require a license to use the H-D Marks because merchandise bags were a supply item, and thus, not resold. See, *e.g.*, Ex. 18 to Cohen Dep. (Email from Mr. Cohen to dealer dated May 9, 2008, stating: "these items are not being sold and therefore do not require that [PSI] be [*11] licensed"); Ex. 5 to Cohen Dep. at PSI17728 (Cohen letter to dealer dated Nov. 5, 2007, stating: "If you further check your agreement you will see that supply items do not need to be licensed. Bags are a supply item.").

---

[3]  PSI has claimed that it assumed that it had the right to use H-D Marks because certain unnamed Harley-Davidson dealers at some point prior to 2006 told PSI that it could reproduce the H-D Marks on goods not offered for resale. PSI never verified the accuracy of its assumption that it could use the H-D Marks on its merchandise bags. PSI has never seen a Harley-Davidson Dealer Contract and has no knowledge of the terms under which Harley-Davidson dealers could use H-D Marks.

2011 U.S. Dist. LEXIS 50897, *11; 100 U.S.P.Q.2D (BNA) 1348, **1351

In fact, the contracts between Harley-Davidson and its dealers contained no such provision. Harley-Davidson enters into Motorcycle Dealer Contracts with each of its authorized dealers. The Dealer Contract sets out the terms under which a dealer may use the H-D Marks and includes specific terms governing when dealers may purchase products from third parties when those products incorporate H-D Marks. [4] The Contract provides that "dealers are not permitted to purchase goods for distribution products bearing H-D Marks from any source other than Harley-Davidson or its authorized licensees without prior approval of Harley-Davidson." Ex. 2, to Merten Decl., Sample Motorcycle Dealer Contract, at § K(3); see also *id*. (dealers are not permitted to have products created on its behalf incorporating H-D Marks for distribution to customers). There is no term in the Dealer Contract [**1352] that allows third parties to use H-D marks if the products on which the Marks were to be used are not [*12] intended for resale. Further, there is no term in the Dealer Contract that requires dealers to purchase merchandise bags from Harley-Davidson in order to receive Harley-Davidson motorcycles.

## C. Dealer and End-User Confusion

Harley-Davidson has submitted evidence that establishes that both Harley-Davidson dealers and their customers were or would be confused by Plaintiff's use of the Marks.

First, Harley-Davison has introduced evidence that shows that PSI's unauthorized use of H-D Marks on its bags and in its promotional materials confused at least seven of their dealers regarding whether PSI was authorized to supply merchandise bags bearing H-D Marks. A number of dealers testified that they either assumed that Plaintiff was so authorized or that Plaintiff told them that they could use the Marks.

Further, PSI understood that Harley-Davidson dealers used the merchandise bags produced by PSI to package merchandise such as genuine Harley-Davidson accessories and MotorClothes apparel purchased by [*13] consumers in their dealerships. PSI intended for dealership customers to use its merchandise bags bearing H-D Marks over and over again following their purchase of merchandise. See, *e.g.* A Ex. 20 to Topczewski Dep. (fax from Mr. Topczewski to dealer dated Aug. 8, 2007, stating: "We tried to come up with a size we thought would be very good for people to use again and again. Something they can use to go shopping or even for the day at the beach.").

## II. Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, 359 F.3d 925, 928 (7th Cir. 2004)*.

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. [*14] A genuine issue of material fact exists if "the evidence is

---

[4]   The Dealer Contracts provide that "dealers have no rights to use H-D Marks except as specifically provided in Dealer Contract." Ex. 2, to Merten Decl., Sample Motorcycle Dealer Contract, Part 1(C).

2011 U.S. Dist. LEXIS 50897, *14; 100 U.S.P.Q.2D (BNA) 1348, **1352

such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248*. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id. at 322*. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson, 477 U.S. at 252*.

**III. Analysis**

**A. Harley-Davidson's Motion for Summary Judgment on their Counterclaims for Trademark Infringement and Unfair Competition**

Counterclaim Plaintiffs move for partial summary judgment as to liability on **[*15]** their counterclaims for trademark infringement under Section 32(1) of the Lanham Act (*15 U.S.C. § 1114(1)*) (Count I); false designation of origin (unfair competition) under Section 43(a)(1)(A) of the Lanham Act (*15 U.S.C. § 1125(a)(1)(A)*) (Count II); common law unfair competition under Illinois state law (Count V); and violation of the Illinois Uniform Deceptive Trade Practices Act (*815 ILCS 510/1 et seq.*) (Count VII). These counterclaims are specifically directed to PSI's unauthorized (and continuing) use of the H-D Marks.

Each of the four trademark-related counterclaims at issue in this motion involves the same elements and proofs. See *Spex, Inc. v. The Joy of Spex, Inc., 847 F. Supp. 567, 579 (N.D. Ill. 1994)* (citing *Gimix, Inc. v. JS & A Group, Inc., 699 F.2d 901, 908 (7th Cir. 1983)* (holding **[**1353]** that "[c]laims for unfair competition and deceptive business practices [involving trade names] brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act" and noting that "Illinois courts look to federal case law and apply the same analysis to state infringement claims"); see also *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) **[*16]** (same). To establish liability on the counterclaims, Harley-Davidson must demonstrate that: (1) it has protectable rights in the asserted trademarks; and (2) PSI's use of these marks is likely to cause confusion. See *CAE, Inc. v. Clean Air Eng'g, Inc., 267 F.3d 660, 673-74 (7th Cir. 2001)*. Proof of these same two elements is required for both federal claims in this case: trademark infringement, *15 U.S.C. § 1114*, and unfair competition, *15 U.S.C. § 1125(a)*. See *Packman v. Chicago Tribune Co., 267 F.3d 628, 638 n.8 (7th Cir. 2001)*.

Because there is no genuine issue of material fact with respect to either element, the Court grants summary judgment in favor of Harley-Davidson as to PSI's trademark violations. First, Harley-Davidson's protectable interest in the H-D marks is beyond dispute and is in fact undisputed. As discussed above, Harley-Davidson owns several Principal Register federal trademark registrations covering its famous H-D Marks in connection with a wide variety of goods. As the owner of the federal registrations, Harley-Davidson is entitled to several statutory presumptions under the Lanham Act federal trademark statute, including that its certificate of registration constitutes **[*17]** "prima facie

2011 U.S. Dist. LEXIS 50897, *17; 100 U.S.P.Q.2D (BNA) 1348, **1353

evidence of the validity of the registered mark[s] * * *, of the owner's ownership of the mark[s], and of the owner's exclusive right to use the registered mark[s] in commerce on or in connection with the goods * * * specified in the certificate * * *." *15 U.S.C. § 1057(b)*. Moreover, Harley-Davidson's rights in the H-D Marks are deemed incontestable by the U.S. Patent & Trademark Office. As a result, the H-D Marks are entitled to the highest degree of protection afforded under the Lanham Act. See *15 U.S.C. § 1065*; *Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 371 (7th Cir. 1976)*. These trademark registrations and the statutory rights conferred thereby are effective not only against unauthorized uses of the Marks in connection with identical goods, but also against unauthorized uses in connection with "***related*" goods**. See *CAE, Inc., 267 F.3d at 679*.

In addition to its federal registrations covering ***related goods***, Harley-Davidson has established that it owns common law trademark rights covering use of the H-D Marks on merchandise bags—the very goods at issue in this litigation—by virtue of its widespread use of the H-D Marks on its merchandise bags since at least **[*18]** 1987. Harley-Davidson offers these merchandise bags bearing the H-D Marks through its dealer catalogue, and since 2004, has sold more than forty million merchandise bags bearing the H-D Marks to its dealers. Harley-Davidson's common law trademark rights are also actionable under the Lanham Act, *15 U.S.C. 1125(a)*. See, *e.g. Johnny Blastoff, Inc. v. Los Angeles Rams Football Co., 188 F.3d 427, 435 (7th Cir. 1999)*.

Moving on to the second element of Harley-Davidson's causes of action, there is no genuine issue of material fact that PSI's use of the HD-Marks is likely to cause confusion. Courts in the Seventh Circuit analyze the likelihood of confusion under a seven-factor test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another." *Packman, 267 F.3d at 643*. No single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented, although, in many cases, the similarity **[*19]** of the marks, the defendant's intent, and actual confusion are particularly important. *Id*. No matter what weight the Court assigns the various factors, Harley-Davidson has conclusively established a likelihood of confusion.

With regard to the first factor, this is not a case involving confusingly similar marks. Rather, there is no dispute that PSI has used and is using the actual H-D Marks as part of the artwork on all merchandise bags that it produces for Harley-Davidson dealers.

Similarity of the parties' products is the second factor in the likelihood of confusion test. See *CAE, 267 F.3d at 678-79*. This factor does not require identical products or direct competition, **[**1354]** only a showing that the parties' goods are "sufficiently related to create an inference in consumer's minds that the products came from the same source." *Id. at 679* (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1089 (7th Cir. 1988))*. Harley-Davidson's federal trademark registrations cover clothing, jewelry, helmets, and many other goods that its independent dealers offer to consumers. Harley-Davidson's dealers, in turn, place these Harley-Davidson branded goods in merchandise bags provided **[*20]** to their customers at the check-out counter. PSI's accused merchandise bags are sufficiently

2011 U.S. Dist. LEXIS 50897, *20; 100 U.S.P.Q.2D (BNA) 1348, **1354

related to and used in conjunction with goods in which Harley-Davidson owns exclusive trademark rights by virtue of its federal trademark registrations. Moreover, Harley-Davidson owns common law trademark rights in *identical* goods; namely, merchandise bags bearing the H-D Marks. Consequently, this factor is easily satisfied because both Harley-Davidson and PSI sell identical products—merchandise bags—to independent Harley-Davidson dealers who distribute the bags to consumers purchasing branded merchandise.

Regarding the third factor, PSI and Harley-Davidson sell their merchandise bags in identical trade channels. PSI sells its accused merchandise bags to Harley-Davidson dealers, many of whom also purchased genuine merchandise bags directly from Harley-Davidson.

The fourth factor analyzes the degree of care likely to be exercised by customers of the products at issue. See *CAE, 267 F.3d at 682-83*. There are a number of reasons why this factor weighs in favor of a strong likelihood of confusion. For one, the retail consumers who ultimately receive PSI's merchandise bags are provided those bags for **[*21]** free and therefore would not be in a position to exercise care in selecting the bags. These retail customers have no way of knowing whether those bags were produced by an authorized Harley-Davidson supplier, nor do potential customers encountering PSI's bags in the post-sale context. Harley-Davidson's reputation is therefore beyond its own control, in violation of the Lanham Act. *See 15 USC § 1125(a)(1)(A)*; *CAE, 267 F.3d at 683*; *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986)* ("[T]he trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.'").

The fifth factor—the strength of the marks—clearly favors Harley-Davidson. See *CAE, 267 F.3d at 684*. The H-D Marks are among the world's most famous trademarks. Harley-Davidson has spent hundreds of millions of dollars on advertising, promoting, and marketing products and services under the Marks and has sold millions of motorcycles bearing its Marks. Where, as here, the case involves strong and famous marks, "the law imposes a heightened obligation on others to give [the H-D Marks] a wide berth." *Sara Lee Corp. v. American Leather Products, Inc., 1998 U.S. Dist. LEXIS 11914, 1998 WL 433764, at *10 (N.D. Ill. July 29, 1998)* **[*22]** (citing *James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976))*.

With regard to the sixth factor—evidence of actual confusion—Harley-Davidson has provided declarations from several of its dealers that explain that they were confused by PSI's unauthorized use of the H-D Marks. These dealers stated that PSI's use of the H-D Marks on flyers, its distribution of sample bags produced for other dealers bearing the H-D Marks, and its misrepresentations regarding PSI's authority to supply dealers with such bags, caused them to believe PSI was an authorized supplier.

Lastly, courts in this Circuit examine the accused infringer's intent to "palm off" its products. See *CAE, 267 F.3d at 686*. Here, the record is replete with facts that suggest that PSI deliberately and intentionally used the H-D Marks and acted in a manner intended to confuse Harley-Davidson dealers as to PSI's rights to use those marks. The Court need only provide a few illustrative examples of facts that suggest this intent. For one, PSI's use of the H-D Marks was not occasional or episodic: every (or nearly every) bag that PSI has sold to a Harley-Davidson dealer bears at least one of the H-D Marks. **[*23]** Indeed, PSI

2011 U.S. Dist. LEXIS 50897, *23; 100 U.S.P.Q.2D (BNA) 1348, **1354

continued to exploit the H-D Marks for its benefit despite knowledge that Harley-Davidson considered PSI's use unauthorized. When questioned by dealers as to PSI's authorization to use the H-D Marks following the June 2007 Notice, PSI continued to represent to Harley-Davidson dealers that PSI did not require a license to use the H-D Marks, without obtaining a legal opinion and without any knowledge **[\*\*1355]** of the Harley-Davidson dealer contracts, and despite the unequivocal statements from Harley-Davidson to the contrary.

There is no genuine issue of material fact as to the validity of the H-D Marks and the likelihood of confusion caused by PSI's activities. Accordingly, the Court enters partial summary judgment favor of Harley-Davidson on liability for its trademark-based counterclaims (Counts I, II, V, and VII).

## B. Harley-Davidson's Motion for Summary Judgment on Plaintiff's Antitrust and Tort Claims

The Court discussed PSI's claims in detail in its prior order denying Harley-Davidson's motion to dismiss, see *Packaging Supplies, Inc. v. Harley-Davidson, Inc., 2009 U.S. Dist. LEXIS 25732, 2009 WL 855798 (N.D. Ill. March 30, 2009)*, and refers the reader to that order for a more detailed explanation of Plaintiff's **[\*24]** claims. Briefly, counts I and II of the complaint are, respectively, state law claims for (i) tortious interference with business relationships and for (ii) tortious interference with prospective business advantage. Count III alleges an illegal tying arrangement in violation of *Section 1* of the Sherman Act (*15 U.S.C. § 1*).

The Court concluded its prior order by noting that "[i]t may be that Harley-Davidson merely was protecting its intellectual property rights; if

that is so, this case might easily be resolved at the summary judgment phase." *2009 U.S. Dist. LEXIS 25732, 2009 WL 855798, at *7* (citing *Thermos Co. v. Igloo Products Corp., 1995 U.S. Dist. LEXIS 18382, 1995 WL 745832, at *5 (N.D. Ill. Dec. 13, 1995)* ("[I]t is well-established in this circuit that a trademark holder has the right to defend himself against infringement by sending trademark policing letters to alleged infringers.")). The Court's speculation has been borne out by the record on summary judgment: because PSI has introduced no admissible evidence that Harley-Davidson "tied" the sale of its motorcycles to its dealers' purchase of merchandise bags, or otherwise engaged in improper or unprivileged interference with PSI's business relationships, summary judgment against PSI **[\*25]** and in favor of Harley-Davidson on PSI's complaint is warranted.

First, Plaintiff's tort claims generally involve allegations that Harley-Davidson directed its dealers to cease doing business with PSI. At the motion to dismiss stage, Harley-Davidson had argued that, as an intellectual property rights holder, it was entitled to defend itself against infringement by third parties such as PSI and to warn purchasers that they, too, might be liable. See, *e.g.*, *Thermos Co., 1995 U.S. Dist. LEXIS 18382, 1995 WL 745832, at *5*; *Am. Broadcasting Co. v. Maljack Productions, Inc., 34 F. Supp. 2d 665, 675-76 (N.D. Ill. 1998)*. The Court examined the Notice and agreed with Harley-Davidson that "on its face, the Notice appears to apply only to the use of Harley-Davidson's trademark." *2009 U.S. Dist. LEXIS 25732, 2009 WL 855798, at *5*. The Court reasoned that "were Plaintiff's complaint predicated solely on the text of the Notice, the case would be a prime candidate for dismissal." *Id.* However, the Court did not dismiss Plaintiff's tort claims because the complaint contained allegations that Harley

2011 U.S. Dist. LEXIS 50897, *25; 100 U.S.P.Q.2D (BNA) 1348, **1355

Davidson interfered with PSI's business apart from the Notice that it sent in an effort to protect its trademarks. For instance, Plaintiff had alleged that, in addition **[*26]** to the Notice, Harley-Davidson contacted certain dealers, asked if those dealers purchased bags through PSI, and (if they answered in the affirmative) told those dealers that PSI would not be fulfilling their orders—apparently regardless of whether the bags contained trademarked content. (Here, the Court noted that PSI's complaint did not allege that any or all of the bags it designed for Harley-Davidson dealers contained trademarked content.)

Plaintiffs have introduced no evidence to substantiate any of their allegations. Instead, Defendants have established that all of the bags that PSI sold to Harley-Davidson dealers contained trademarked content. The only communication in the record (the Notice) evidences an attempt by Harley-Davidson to protect itself from PSI's unauthorized use of its trademarks—a privileged communication. Accordingly, the Court grants summary judgment in favor of Harley-Davidson and against Plaintiff on Plaintiff's tort claims. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (the "plain language of *Rule 56(c)* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient **[*27]** to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

The tying claim alleges a tie between sales of Harley-Davidson motorcycles (the tying product) and sales of plastic merchandise bags **[**1356]** (the tied product). To establish an unlawful tying claim, PSI must prove that Harley-Davidson: (1) imposed a tying arrangement between two distinct products (in this case motorcycles and merchandise bags);

(2) possessed sufficient economic power in the tying market to appreciably restrain competition in the tied product market; and (3) a not insubstantial amount of interstate commerce was affected. *Reifert v. S. Cent. Wis. MLS Corp., 450 F.3d 312, 316-317 (7th Cir. 2006)*. Plaintiff's tying claim fails for a complete absence of evidence regarding the first two elements; however, the Court need only discuss the first.

PSI has introduced no evidence that suggests that Harley-Davidson conditioned the sale of motorcycles on its dealers' purchase of merchandise bags—an essential element of its antitrust claim. See *Sheridan v. Maraton Petroleum Co., LLC, 530 F.3d 590, 592 (7th Cir. 2008)* (conditioning required). "The joint **[*28]** sale of two products is a 'tie' only if the seller exploits its control of the tying product 'to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'" *Will v. Comprehensive Accounting Corp., 776 F.2d 665, 669 (7th Cir. 1985)* (quoting *Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984))*. Thus, "[t]o survive summary judgment, [PSI] must present admissible evidence, not mere speculation, that [Harley-Davidson] coerced its [dealers]" to purchase merchandise bags or suffer the loss of the motorcycle line. *Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1161 (9th Cir. 2003)*. Plaintiff has failed to meet this burden.

Indeed, the Court has examined the Notice and the relevant portions of the Harley-Davidson dealer contract and found no language in either document that requires dealers to purchase merchandise bags from Harley-Davidson, whether as a condition to receive motorcyle shipments or otherwise. There is no evidence in the record from any

2011 U.S. Dist. LEXIS 50897, *28; 100 U.S.P.Q.2D (BNA) 1348, **1356

other source that suggests that Harley-Davidson coerced its dealers in any way or tied the purchase of the two products [*29] together. This failure of proof of "conditioning" or a "tie" compels dismissal of this claim. See, *e.g., Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 722-24 (7th Cir. 1979)*.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment on all of the counts of Plaintiff's complaint [71] is granted.

Counterclaim Plaintiffs' motion for partial summary judgment on Counts I, II, V, and VII of their counterclaim (the counts that allege trademark infringement and unfair competition) [73] also is granted.

Dated: May 12, 2011

/s/ Robert M. Dow, Jr.

Robert M. Dow, Jr.

United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MICHAEL KORS, L.L.C. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-8612 |
| | ) | |
| v. | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| THE PARTNERSHIPS and | ) | **Magistrate Judge Jeffrey T. Gilbert** |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A," | ) | |
| | ) | |
| Defendants. | ) | |

## SEALED TEMPORARY RESTRAINING ORDER

THIS CAUSE being before the Court on Plaintiff Michael Kors, L.L.C.'s ("Michael Kors") *Ex Parte* Motion for entry of a Temporary Restraining Order, Domain Name Transfer Order, Asset Restraining Order, Expedited Discovery Order and Order to allow Service by Electronic Mail and Electronic Publication (the "Ex Parte Motion") against the Partnerships and Unincorporated Associations identified in Schedule A, and attached hereto, by each unique email address (collectively, the "Defendants") and using at least the domain names identified in Schedule A (the "Defendant Domain Names") and the online marketplace accounts identified in Schedule A (the "Online Marketplace Accounts"), and this Court having heard the evidence before it hereby GRANTS Plaintiff's Ex Parte Motion in its entirety and orders that:

1. Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily enjoined and restrained from:

1

a. using Michael Kors' MICHAEL KORS Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Michael Kors product or not authorized by Michael Kors to be sold in connection with Michael Kors' MICHAEL KORS Trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Michael Kors product or any other product produced by Michael Kors, that is not Michael Kors' or not produced under the authorization, control or supervision of Michael Kors and approved by Michael Kors for sale under Michael Kors' MICHAEL KORS Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Michael Kors, or are sponsored or approved by, or otherwise connected with Michael Kors;

d. further infringing Michael Kors' MICHAEL KORS Trademarks and damaging Michael Kors' goodwill;

e. otherwise competing unfairly with Michael Kors in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Michael Kors, nor authorized by Michael Kors to be sold or offered for sale, and which bear any of Michael Kors' MICHAEL KORS Trademarks or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell Counterfeit Michael Kors Products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product bearing Michael Kors' MICHAEL KORS Trademarks or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine Michael Kors product or not authorized by Michael Kors to be sold in connection with Michael Kors' MICHAEL KORS Trademarks.

2. The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within two (2) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Michael Kors' selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to a registrar of Michael Kors' selection until further ordered by this Court.

3. Those in privity with Defendants and with actual notice of this Order, including any online marketplaces such as iOffer, social media platforms such as Facebook, YouTube, LinkedIn and Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts, domain name registrars and domain name registries, shall immediately:

a. disable and cease providing services for any accounts through which Defendants engage in the sale of counterfeit and infringing goods using the MICHAEL KORS

3

Trademarks, including any accounts associated with the Defendants listed on Schedule A;

b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the MICHAEL KORS Trademarks; and

c. Take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index.

4. Discovery herein by Michael Kors may continue by providing actual notice, pursuant to subpoena, e-mail or otherwise, of this Order to any of the following:

a. Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them;

b. any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, or other merchant account providers, payment providers, third party payment processors, and credit card associations (e.g., MasterCard and VISA), which receive payments or hold assets on Defendants' behalf; or

c. any third party service providers, including, without limitation, the online B2B selling platforms including iOffer, Internet service providers, backend service providers, web designers, sponsored search engine or ad-word providers, shippers, domain name registrars and domain name registries who have provided services for Defendants.

5. Any third party with actual notice of this Order and providing services in connection with any of the Defendants, Defendants' websites at the Defendant Domain Names or other

websites operated by Defendants, including, without limitation, Internet Service Providers ("ISP"), back-end service providers, web designers, sponsored search engine or ad-word providers, banks, merchant account providers including PayPal, third party processors and other payment processing service providers, shippers, domain name registrars and domain name registries (collectively, the "Third Party Providers") shall, within two (2) business days after receipt of such notice, provide to Michael Kors copies of all documents and records in such person's or entity's possession or control relating to:

a. The identities and addresses of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them and the locations and identities of Defendants' operations, including, without limitation, identifying information associated with Defendants' Websites, the Defendant Domain Names and financial accounts;

b. Defendants' websites;

c. The Defendant Domain Names or any domain name registered by Defendants; and

d. Any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Western Union, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

6.   Defendants and any persons in active concert or particiapation with them who have actual notice of this Order shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7.   Any banks, savings and loan associations, payment processors, PayPal or other financial institutions, for any Defendant or any of Defendants' websites shall within two (2) business days of receipt of this Order:

   a.   Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts connected to the email addresses listed in Schedule A hereto; and

   b.   Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

8.   Michael Kors may provide notice of these proceedings to Defendants, including notice of the preliminary injunction hearing and service of process pursuant to Fed.R.Civ.P 4(f)(3), by electronically publishing a link to the Complaint, this Order and other relevant documents on a website to which the Defendant Domain Names which are transferred to Michael Kors' control will redirect, and by sending an e-mail to the e-mail addresses identified in Schedule A to Michael Kors' Complaint that includes a link to said website. The combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from domain name registrars and payment processors, shall constitute notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

9. Schedule A to the Complaint and Exhibits 7 and 8 to the Declaration of Lilly Stone shall remain sealed until further ordered by this Court.

10. Michael Kors shall deposit with the Court Ten Thousand Dollars ($10,000.00) as security, to be paid from Michael Kors or Michael Kors' counsel's Interest on Lawyers Trust Account (IOLTA), which amount was determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

11. Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Michael Kors or on shorter notice as set by this Court.

12. This Temporary Restraining Order without notice is entered at 9:30 A.M. on December 5, 2013, and shall remain in effect for (14) fourteen days.

U.S. District Court Judge Rebecca R. Pallmeyer

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
LORILLARD TOBACCO COMPANY, a Delaware
Corporation, Plaintiff,
v.
MONTROSE WHOLESALE CANDIES and Sundries, Inc., et al., Defendants.

Nos. 03 C 4844, 03 C 5311.
Nov. 8, 2005.

John S. Pacocha, Cameron Matthew Nelson, Jeffrey G. Mote, Kevin D. Finger, Greenberg Traurig, LLP, Chicago, IL, for Plaintiff.

Robert A. Egan, Robert A. Egan P.C., Robert A. Hobib, Chicago, IL, for Defendants.

### *REPORT AND RECOMMENDATION*
MARVIN E. ASPEN, Judge.

**\*1** Plaintiff, Lorillard Tobacco Company ("Lorillard"), moves to freeze the assets of defendants Reza and Sandra Hazemi This matter originally came before me as a motion to freeze the assets of the Hazemis and Montrose Wholesale Candies and Sundries, Inc. ("Montrose")(collectively, "Montrose defendants"). Judge Aspen had referred that motion to Magistrate Judge Keys, and the referral was subsequently transferred to me. Accordingly, the court addresses Lorillard's motion for an order freezing the Hazemis' assets in this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[FN1]

> FN1. Under 28 U.S.C. § 636(b)(1)(A), "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, *except a motion for injunctive relief,* for judgment on the pleadings, for summary judgment, to dis-

miss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action." Under section 636(b)(1)(B), "a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court *proposed findings of fact and recommendations for the disposition,* by a judge of the court, of any motion excepted in subparagraph (A). Lorillard's motion to freeze assets is a motion for injunctive relief..

### I. BACKGROUND

Lorillard is one of the largest cigarette manufacturers in the United States and its brand, Newport, is the best-selling menthol cigarette in the country. Lorillard has registered the trademark, Newport, with the United States Patent and Trademark Office, giving it the exclusive right to manufacture, distribute, advertise, and sell Newport cigarettes in the United States. Lorillard distributes its cigarettes through a network of wholesalers and retailers, subject to a wide range of state and federal regulations. Over the past several years, the federal government and many states have substantially increased taxes on cigarettes and other tobacco products, which has made it profitable for "bootleggers" to sell counterfeit tobacco products, as well as import and distribute tobacco products in a manner designed to avoid paying the taxes, thereby reaping a handsome, but ill-gotten reward.

In July of 2003, one of Lorillard's division managers paid a call on the Montrose store in Chicago, Illinois, and purchased a carton of what he suspected to be counterfeit Newport cigarettes, and sent it for inspection to Lorillard's offices in Greensboro, North Carolina. There, a quality assurance inspection convinced Lorillard that the cigar-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

ettes were counterfeit and it filed this suit against Montrose on July 14, 2003, alleging trademark violations under the Lanham Act 15 U.S.C. § 1051, *et seq.*, as well as various Illinois statutory violations and common law offenses. On July 15, 2003, Judge Marvin Aspen granted Lorillard's application for an ex parte seizure order allowing Lorillard to seize any counterfeit cigarettes, as well as records documenting the manufacture, importation, purchase, sale, distribution, or receipt of any merchandise bearing any Lorillard marks. The United States Marshals Service returned service on the seizure of four cartons of "counterfeit cigarettes and documents" on July 16, 2003. Montrose's owners, Reza and Sandra Hazemi, have since been added as defendants.

After enduring a maddening course of fruitless attempts at garnering any meaningful discovery from Montrose and the Hazemis, and becoming understandably suspicious that the Hazemis were looting Montrose's assets, Lorillard filed a motion to compel discovery and to freeze the assets of Montrose and the Hazemis, supporting it with over 1200 pages of documents detailing what Lorillard has learned, and has had to endure, over a year-and-a-half.[FN2] In the interim, however, and less than a week after being informed that the court was preparing to rule on Lorillard's motions, Montrose filed a Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of Illinois on September 7, 2005. This stayed the proceedings as to the corporate defendant.[FN3] On September 9, 2005, the Hazemis filed a motion before me to stay these proceedings as to them, which I denied on the grounds that I did not have the authority to rule on the motion and that it should have been filed before Judge Aspen. To date, the Hazemis have not filed an appropriate motion before Judge Aspen.

> FN2. To support its motions, Lorillard filed the exhibits mentioned, as well as: (1) a declaration, (2) a substitute declaration, (3) a second declaration by Lorillard's counsel, (4) a declaration in support of the

emergency motion, and (5) the actual motions and supporting memoranda. Through a good portion of the declarations and the memoranda, however, Lorillard fails to cite to pages of the voluminous record that support many of its assertions. Thus, in some instances, Lorillard often merely directs the court to entire 200-plus-page deposition transcripts or 100-page business transactions to locate specific quotes. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 4(¶¶ 6-7); (Substitute) Declaration of Jeffrey Mote, ¶¶ 10-11, 14-15, 22, 39; Second Declaration of Jeffrey Mote, at ¶¶ 22, 34). In other instances, it does not even provide a general reference to any supporting documentation (*See, e.g.,* (Substitute)Declaration of Jeffrey Mote, ¶¶ 28-29, 32-34, 41, 42, 43, 44) or-more understandably given the volume of materials prepared-misidentifies purported supporting materials or fails to make pages part of the record. (*See, e.g.,* Combined Motion to Compel Discovery and Freeze Assets, at 6(¶ 12); (Substitute) Declaration of Jeffrey Mote, at ¶¶ 28-29, 32-34, 41, 42, 43, 44; Second Declaration of Jeffrey Mote, at ¶¶ 22, 64, 65). At the court's request, Lorillard's counsel filed a consolidated declaration which corrected some, but not all, of these deficiencies. The few that remain, however, do not make Lorillard's tale of woe any less compelling; those assertions that Lorillard does adequately support with evidence and the court's own perusal of the record provide enough detail regarding the Montrose defendants' discovery obfuscation and financial legerdemain for the court to grant Lorillard's motion.

> FN3. On November 1, 2005, Bankruptcy Court Judge Hollis granted Lorillard's motion to modify the automatic stay to permit Lorillard to continue its lawsuit against the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)

**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

corporate defendant, Montrose.

**\*2** On October 31, 2005, Lorillard filed an emergency motion to freeze the assets of the individual defendants Ray and Sandra Hazemi. Lorillard's motion was prompted by its discovery that the Hazemis own certain property at 3019 N. Rose St. in Franklin Park, Illinois, despite the Hazemis' repeated denials, under oath, to the contrary. As it happens, this is merely the most recent installment in a continuing saga of deception, obfuscation, shuffling of assets, and corporate looting. While the evidence demonstrates that this has long been the Hazemi's pattern of doing business, it most recently has been calculated to place the Hazemi's assets beyond the reach of Lorillard. This most recent revelation regarding the property at 3019 N. Rose St. demonstrates that Mr. Hazemi has not only given what appears to be perjured deposition testimony, but made bald misrepresentations to the court regarding their ownership of the property. When examined in insolation, this episode alone would be sufficient to support an order freezing their assets. But when examined in context of what has gone on before, there can be no question that such an order is warranted.

**A**

**The Hazemis' Misrepresentations Regarding Their Ownership of the Property at 3019 N. Rose St.**

During its long and arduous discovery experience in this case, Lorillard has brought several motions to obtain compliance with subpoenas served on various third parties, including a business located at 3019 N. Rose Street in Franklin Park, Illinois (the "3019 N. Rose St. Property") doing business as "Franklin Cigarette Depot." Through the discovery it was able to gain, Lorillard learned that defendant Sandra Hazemi had owned the 3019 N. Rose St. Property and transferred it to a Janesville, Wisconsin wholesale supplier named Chambers & Owens in or about June 2003 as part of a settlement in a lawsuit between Chambers & Owens and defendant Montrose Wholesale. During Mrs.

Hazemi's deposition she indicated that she was an "owner" in name only [FN4] and that the details concerning the purchase and transfer of the 3019 N. Rose Street Property, among others, were entirely controlled by Ray Hazemi. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. A, Sandra Hazemi Dep. of 7/26/05 at 359-65). During his deposition on July 21, 2005, Ray Hazemi testified that the Hazemis transferred the 3019 N. Rose Street Property to Chambers & Owens in 2003 and that Chambers & Owens still owned the property on the day of the deposition. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. B, Ray Hazemi Dep. of 7/21/05 at 94). Mr. Hazemi further testified that he and his wife were attempting to get the property back from Chambers & Owens. (*Id.*).

> FN4. The phrase "in name only" takes on a curious meaning here, as nearly every document associated with the Hazemi's transfer of the 3019 N. Rose St. property identifies the owner as "Sean Semler" or "Sandra Semler Hazemi a/k/a Sean Semler." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. D; *Declaration of Jeffrey Mote in Support of Emergency Motion to Freeze Assets,* Exs. H at RN 0257; I at 00444; J at 0221, 0229; L; M). Sean Semler is Mrs. Hazemi's brother. At their depositions, neither Mr. nor Mrs. Hazemi could hazard a guess as to why these documents referred to Mrs. Hazemi in this manner.

Ray Hazemi's deposition continued on August 3, 2005. Once again, plaintiff asked whether Chambers & Owens still owned the 3019 N. Rose St. property and Mr. Hazemi states "[t]hat's correct." (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. C, Ray Hazemi Dep. of 8/3/05, at 350). When Mr. Hazemi was asked whether he has had discussions with Chambers & Owens about the return of the 3019 N. Rose St. property, he answered: "[n]o, nothing." (*Id.* at 535). But he added that he and his wife were trying to work out a plan by which the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

property could be returned to them. (*Id.* at 535-36).

**\*3** The subject of the 3019 N. Rose St. property also came up in court. The parties' counsel appeared before me on July 25 and August 1, 2005, in connection with plaintiff's motion for rule to show cause why Franklin Cigarette Depot should not be held in contempt for failing to respond to a duly served subpoena. (*Plaintiff's Emergency Motion to Freeze Assets,* Exs. D and E, Hearing Transcript Excerpts for the 7/25/05 and 8/1/05 hearings, respectively). These particular hearings concerned the Hazemis' ownership of Franklin Cigarette Depot and the property associated with it located at 3019 N. Rose St. During the July 25, 2005 hearing, the Hazemis' counsel, Robert A. Habib, stated that Ray Hazemi had admitted during his July 21, 2005 deposition that he had an ownership interest in Franklin Cigarette Depot, but that he did not own the real property because it had been turned over to Chambers & Owens. Mr. Habib stated unequivocally that Ray Hazemi testified that the 3019 N. Rose Street Property was no longer owned by the Hazemis, stating "the real estate is gone." (Ex. D at pp. 5-6). Similarly, during the August 1st hearing, Mr. Habib stated that "[t]he property at 3019 North Rose Street they don't own anymore." (Ex. E, pp. 10-11).

As it happens, the Hazemis misrepresented the facts surrounding the Hazemi's ownership of the 3019 N. Rose St. property at their depositions and in open court.[FN5] During a Rule 341 Meeting of Creditors (the "341 Meeting") on September 24, 2005, in connection with Montrose's Chapter 11 Bankruptcy case, Chambers & Owens' counsel Scott Shadel informed plaintiffs counsel that Chambers & Owens had transferred the 3019 N. Rose Street Property back to the Hazemis in 2003. Mr. Shadel also indicated he believed the Hazemis had purchased the property back from Chambers & Owens for about $250,000. On October 21, 2005, Mr. Shadel faxed a copy of the Warranty Deed prepared by Chambers & Owens to transfer the 3019 N. Rose St. property to Sandra Hazemi on September 2, 2003. (*Plaintiff's Emergency Motion to*

*Freeze Assets,* Ex. F).

    [FN5]. It would also appear that the Hazemi's attorney, Mr. Habib, was victimized by their misrepresentations as well. An able and experienced lawyer, Mr. Habib certainly would not have accepted his client's assertions at face value. Yet, he, too, was taken in by the Hazemis, and employed-unwittingly-in their ruse.

When these serious circumstances came to light by way of Lorillard's emergency motion, I allowed the Hazemis and their attorney a week to file whatever they felt might be an adequate response to being caught in a lie. After what one must assume was a complete and thorough consultation among clients and counsel, Mr. Hazemi offers an explanation by way of a rather sketchy, five-paragraph affidavit.[FN6] He states that the transfer of the 3019 N. Rose St. property was made to stop Chambers & Owens from collecting on the judgment from Mr. Hazemi only. When he sold another parcel of property for $250,000, he applied those assets to the judgment as against him. Mr. Hazemi asserts that a Mr. Phil Jackson of Chambers & Owens then "handed [him] a piece of paper and stated that no longer we owe Chambers, but that the debt as to Montrose remained pending." (Reza Hazemi Aff., ¶ 4). The piece of paper, according to Mr. Hazemi, turned out to be the warranty deed, but he swears he did not look at it at the time or know what it was. Instead, he simply put it in his safe, where it languished uninspected until Lorillard filed this motion. (Reza Hazemi Aff. ¶ 4). Similarly, Mrs. Hazemi also swears that she never saw the warranty deed. (Sandra Hazemi Aff.).

    [FN6]. While Mr. Habib prepared the Hazemis' affidavits in consultation with them, he did not sign the documents. Only the Hazemis have sworn to their veracity.

**\*4** According to Mr. Hazemi, he regarded the mysterious piece of paper as proof that his personal debt to Chambers & Owens had been discharged by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

payment of $250,000. (Reza Hazemi Aff., ¶ 4). Having never looked at the document-that is what he claims-it is curious how he can be so sure that it amounted to such proof. As Mr. Hazemi tells the tale, the paper might have been anything at all. Why he was confident that it proved he had paid Chambers & Owen $250,000 is unexplained. Having handed over a quarter-million dollars to satisfy a debt, one might expect even the least sophisticated of businessmen to inspect the note received in return. But Mr. Hazemi is by no means an unsophisticated businessman. He has a masters degree in accounting, and counsel has represented that he has practiced as a CPA in the past. He owns or has owned several businesses with millions of dollars of revenue running through them. The Hazemi's explanation that they were simply unaware that they owned the 3019 N. Rose St. property strains credulity past the breaking point.

The 3019 N. Rose St. property, then, has been in the possession of the Hazemis all along, a hidden asset during this litigation. To ensure that it remained hidden, the Hazemis committed what appears to be perjury at their depositions, then lied to me in an inherently incredible affidavit. Given the history of the Hazemis' conduct in this litigation, and the manner in which they operated their business, however, none of this is surprising. It is just the latest in a long line of underhandedness and deception, as the following discussion will make clear.

**B**
**The Organization and Structure of the Montrose Corporation**
**1**
**The Hazemis' Acquisition of the Corporation**

Shortly after filing suit, Lorillard served Montrose with its first set of interrogatories and document requests, which regarded, in part, Montrose's corporate structure, organization, and financial condition. ((Substitute)Declaration of Jeffrey G. Mote, ("Mote Decl."), Ex. A). In what would become a disheartening pattern for Lorillard, Montrose and the Hazemis initially thwarted Lorillard's discovery efforts. Montrose did, however, produce income tax records for the years 1997 through 2003, which revealed its ownership structure during that period:

1997 Tarek Al-Mikhi (50%); Sandra Semler Hazemi (25%); Jack Shoushtari (25%)

1998 Sandra Semler Hazemi (50%); Jack Shoushtari (50%)

1999 Mr. Hazemi (50%); Jack Shoushtari (50%)

2000 Mr. Hazemi (50%); Jack Shoushtari (50%)

2001 Mr. Hazemi (100%)

2002 Mr. Hazemi (100%)

2003 Mr. Hazemi (50%); Sandra Semler Hazemi (50%)

(Mote Decl., ¶ 7; Ex. I). Finally, on March 8, 2005, after more than a year-and-a-half of awaiting the twice-promised production, Lorillard filed a motion to compel discovery.

At least with respect to the corporate records, the motion did the trick: Montrose produced the documents, however unapologetically, in time to take credit for its "compliance" in its response to Lorillard's motion on April 11, 2005. Significantly, in support of the Montrose defendants' response to Lorillard's motion, Mr. Hazemi's wife, Sandra Semler Hazemi, filed an affidavit in which she swore that she had never been a shareholder, officer or director of Montrose and had never authorized anyone to say she was shareholder, officer or director of Montrose, directly contradicting Montrose's tax returns. (*Def.Resp.,* Ex. 8). The first of many such contradictions.

**\*5** The tardily-produced records reveal that Tarek Al-Mikhi originally formed Montrose on or about March 28, 1997. (Second Declaration of Jeffrey Mote ("2nd Decl."), Ex.DD, Articles of Incorporation and related corporate records, RN 48-82).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

The company issued 1200 shares to its three share-holders and directors: Tarek Al-Mikhi (President) received 600 shares, Mr. Hazemi (Vice-President) received 300 shares, and Jack Shoushtari (Secretary/Treasurer) received 300 shares. (Ex. DD, at RN 53). On or about February 6, 1998, the Montrose owners entered into an agreement whereby Tarek Al-Mikhi sold all of his shares in Montrose, transferring 300 each to Mr. Hazemi and Jack Shoushtari. (Ex. DD, at RN 6044-6048). Under the transfer agreement, Mr. Al-Mikhi was paid $89,000 at closing and was to receive another $26,250 on the earlier of January 2, 2000, the date Montrose exercised its option to purchase the property housing Montrose at 4417-4425 W. Montrose Avenue in Chicago Illinois, or the date it sold or otherwise transferred this option. (Ex. DD, at 6045). Shortly thereafter, however, the three became entangled in litigation over the transaction. On or about January 2, 2001, Mr. Shoushtari and Mr. Hazemi entered into a "Stock Sales Agreement", whereby Mr. Hazemi immediately acquired 300 shares of Mr. Shoushtari's original Montrose Stock. (Ex. DD, at RN 279-288).[FN7]

> FN7. The "Stock Sales Agreement was a bit out of the ordinary. It called for Mr. Shoushtari to pay Mr. Hazemi $67,952 pursuant to the following significant representation: "Payment of these monies is as a result of the corporation being insolvent at the time of this transaction, that is, its liabilities exceed its assets." (Ex. DD, at RN 279). Mr. Hazemi also agreed to indemnify Mr. Shoushtari against any judgment in a pending lawsuit, *Certified Grocers v. Montrose/Shoushtari,* Case No. 98 L 14808. (Ex. DD, at RN 284). In addition, Shoushtari agreed to transfer any shares received from Mr. Al Mikhi pursuant to those pending lawsuits to Mr. Hazemi for $1. (Ex. DD, at RN 285). The record suggests that he made this transfer on January 2, 2001. (Ex. DD, at RN 277-78).

**2**
**The Hazemis' Convoluted Acquisition of the Site of Montrose's Operations**

At or near the time Montrose was formed in 1997, it entered into a lease agreement with a Joseph Cholewa, dated March 27, 1997, for the property at 4417-4425 W. Montrose Ave. (Ex. JJ, at RN 84-86). A few days later, on April 3, 1997, Montrose and Mr. Cholewa agreed to a supplemental "Rider" amending the lease agreement by granting, *inter alia,* Montrose an option to buy the property at 4417-4425 W. Montrose for $710,000, to which $7,500 of the $10,500 monthly rent would be credited towards the purchase price of the property. (Ex. JJ, at RN 87-96). In exchange for this purchase option, Montrose paid Mr. Cholewa $60,000, which was to be credited to the eventual purchase price if Montrose exercised its option to purchase. (*Id.*) If Montrose decided not to exercise its option, the "Rider" provided that it was entitled to a "rebate" of two-thirds of the $60,000 option and two-thirds of the $7,500 rent that was to have been allocated towards the purchase price. (*Id.*). Rather than exercising the option outright, Mr. Hazemi and Mr. Shoushtari concocted a scheme whereby they would acquire control of the at 4417-4425 W. Montrose property without appearing to exercise the option, thereby hiding the property as an asset of Montrose and avoiding the need to pay Mr. Al-Mikhi the remaining $26,000 under the stock purchase agreement previously discussed. (Ex. DD, at RN 6045). Once Mr. Cholewa lost his interest in the property sometime between entering into the lease agreement in 1997, and June of 1998, pursuant to a foreclosure proceeding initiated by Parkway Bank & Trust. (Ex. JJ, at GN 187-194), the scheme went into effect.

**\*6** The convoluted process began in June of 1998, when Antonia Shoushtari-Montrose owner Jack Shoushtari's wife-and Bahar Azari-Mr. Hazemi's niece and a then-employee of Montrose-acquired the 4417-4425 W. Montrose property via a Trustee's Deed from Parkway Bank and Trust Company dated June 12, 1998. (Ex. JJ, at SH 65-67). It

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)

**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

would appear from the documents that the two purchased the property for $523,000, taking out a $418,400 loan from Labe Bank. (Ex. JJ, at SH 57). They purportedly managed the property under the name "AB Venture," and the loan was paid off over an 84-month period.[FN8] Next, Antonia Shoushtari transferred her entire interest in the property at 4417-4425 W. Montrose property to Bahar Azari through a quitclaim deed dated January 2, 2001. The transfer between Antonia and Bahar was made for *no* consideration. (Ex. JJ, at GN 184-186). On February 20, 2003, Bahar Azari transferred her entire interest in the 4417-4425 W. Montrose property for *no* consideration via a quitclaim deed to a company called 6201 S. Champlain LLC, which was formed by Mike Kakvand, who will be discussed later. Interestingly, the company listed 4417 W. Montrose, the location of the Montrose store, as its address. (Ex. JJ, at GN 36-38). The very next day, on February 21, 2003, Mr. Kakvand's company executed a resolution purporting to authorize the transfer of the 4417-4425 W. Montrose property (Ex. JJ. at GN 138), and transferred the property to Sandra Hazemi via a warranty deed. (Ex. JJ, at GN 28-35).

> **FN8**. Lorillard submits that rental income from tenants of the property at 4417-4425 W. Montrose would not come close to making this expedited payment schedule. Instead, it would appear that AB Venture was dependent on cash funneled from Montrose to cover the balance of each monthly payment. Although Montrose and the property owners represented that Montrose's rent was $3,500 per month, it was actually paying $6,000 per month by check to Mrs. Shoushtari and Ms. Azari. (Ex. SS). It would seem that utility bills for the property were directed to Montrose and its owners and paid with Montrose's funds. (Ex. SS). Montrose paid for the electrical utilities and property insurance directly, although all these expenses were identified as being paid by the nominal owners of the

property. (*Id.*).

### 3
### Montrose's Shakey Corporate Standing

Despite the Montrose defendants' recalcitrance throughout discovery, Lorillard has been able to uncover some information regarding Montrose's corporate status, which suggests that Montrose has had some difficulty with the Secretary of State for the State of Illinois. The State of Illinois administratively dissolved Montrose on August 1, 1998. On August 10, 2000, Montrose submitted a change of registered agent (changing from Ganders P. Caponize to its counsel in this suit, Robert Egan) to the Illinois Secretary of State as well as an Application for Reinstatement signed by Jack Shoushtari as Montrose' Secretary and Sandra Hazemi as Montrose Vice President. (Ex. DD, at RN 97-101). Mrs. Hazemi's signature in that capacity is rather curious, given the fact that she has sworn that she has never been an officer or director with Montrose. (*Def.Resp.*, Ex. E).

In any event, the State issued a formal Certificate of Reinstatement on August 10, 2000. (Ex. DD, at RN 100). The State administratively dissolved Montrose again a year later on August 1, 2001, and subsequently reinstated it on March 18, 2002. (Ex. DD, at RN 114-116). Continuing the pattern, Montrose was administratively dissolved on August 1, 2003, for failure to file its annual report and pay its annual franchise tax, but was subsequently reinstated on October 3, 2003. (Ex. DD, at RN 117-120). The Montrose defendants claim that Montrose closed its operations as of October 31, 2003 (*Def.Resp.*, at 2, 8), but, as of February 19, 2005, the Illinois Secretary of State's Real Time Corporate/LLC database identified Montrose's status as "Goodstanding." (Ex. K). In the interim, according to Mr. Mote's Second Declaration, Sean Semler, Sandra Hazemi's brother, incorporated Montrose Wholesale Food Co. at Mr. Hazemi's request; it was administratively dissolved on November 1, 2004. (2nd Decl., ¶ 37; Ex. FF). As of May 12, 2005, the database listed Montrose as "Not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

Good Standing." (Ex. FF).

**\*7** It is telling, that the Montrose defendants never produced any records relating to these changes in the corporation's status. Moreover, the Montrose defendants have never disclosed that Montrose is no longer operating in any of their discovery responses; not in Montrose's original October 15, 2003, initial disclosures (Ex. T), or in the Montrose defendants' initial disclosures from on March 1, 2005 (Ex. U). Timely disclosure of this information would have been required under Fed.R.Civ.P. 26(e). Purchase records that Lorillard has obtained through third parties indicate that Montrose continued doing business at least through September of 2004. (2nd Mote Decl., Ex. HH). Similarly, Montrose answered Lorillard's Second Amended Complaint in February 2005, long after it purportedly stopped doing business. That the corporation seems to be an apparition, appearing from time to time, may be no accident, and it is certainly in keeping with the manner in which its financial records were, and are, "kept."

### C
### The Hazemis' Questionable Business Practices
### 1
### Cigarette Purchases

After a long and fruitless pursuit of Montrose's financial records and accounting information, Lorillard appears to be resigned to the fate that business records one might ordinarily expect to exist in an operation with the sales of Montrose simply do not. (*Plaintiff's Reply*, at 9-11). Among these would appear to be records of cigarette purchases. Initially, in its August 2003 responses, Montrose promised to make 10 to 12 boxes of cigarette purchase invoices available for inspection. (Mote Decl., Ex A2, Resp. 3). Montrose's counsel also wrote Lorillard's counsel a letter dated July 25, 2003, indicating the same thing. (*Def.Resp.;* Ex. 3). But Lorillard was still seeking these records at the time of Mr. Hazemi's first deposition on February 2, 2004. (Mote Decl., Ex. C, at 160). That day, Mr. Hazemi explained that records of his purchases were loosely kept in 5 or 6

boxes at the Montrose facility, and Montrose's counsel again stated that Lorillard could inspect the documents. (Mote Decl., Ex. C, at 160-62). Nevertheless, Lorillard had to request these records again when it served discovery requests on Mr. Hazemi. At that time Mr. Hazemi declared that Montrose had already produced them. (Mote Decl., Ex. B1, Resp. 2, 4). By the time of his second deposition, however, he was not as certain.

At Mr. Hazemi's second deposition on December 14, 2004, the topic of these boxes, be there 5 or 6, or 10 or 12, came up once again.

Q: Now, where are these 10 to 12 boxes maintained?

A: I will try to tell you guys. I think you guys took it. You guys say no, but I think you guys took it.

Q: ... [L]ong after the date of the seizure, [you said] you had 10 to 12 boxes ... and you would make them available to us to come to inspect.

I'm asking you, where are those 10 to 12 boxes of documents presently stored?

A: I don't know. I don't know.

\* \* \*

**\*8** Q: So is it possible that you've destroyed or discarded the 10 to 12 boxes?

A: Not whatsoever.

\* \* \*

A: They're someplace in my basement or someplace. I have to find them.

\* \* \*

Q: Is it possible that they might still be at Montrose Wholesale?

A: No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

Q: ... Is there a place other than your house where they might have been taken?

A: No. I take everything to my house.

(Mote Decl., Ex. D, at 231-33).

Later in his deposition, Mr. Hazemi added further confusion to the question of the whereabouts of the cigarette purchase invoices. He testified that when Montrose purchased Newport cigarettes from distributors, he "dumped" the invoices in a cabinet. (Mote Decl., Ex. D, at 209). He did not maintain these purchase invoices, however, but discarded them. (Ex. D, at 210). Shockingly, he testified that he did this even after Lorillard filed suit, seemingly admitting to spoliation of evidence. (Ex. D, at 210). According to Mr. Hazemi, he did not feel the need to keep such records because MSA" [FN9] kept track of these things. (Ex. D, at 210-11).

> [FN9]. According to Lorillard's counsel, the last part of the cigarette distribution chain involves the sale of tobacco products from retailers who are authorized to participate in certain cigarette promotional programs to consumers. Typically, these promotions involve rebate payments-known in the industry as "buydown" programs-wherein an authorized retail distributor is paid a rebate for each carton it sells during the term of the "buydown" program, provided the retailer purchased such carton from an authorized wholesale distributor. Authorized wholesale distributors agree to report all purchases and sales of a particular manufacturer's promotional cigarette products to Management Science Associates, a consultant the tobacco companies employ to collect data on sales and distribution of their products. UPC scanning is a part of this sophisticated and far-reaching information gathering system *See* http://www.msa.com; *Holiday Wholesale Grocery Co. v. Philip Morris Inc.,* 231 F.Supp.2d 1253, 1291 (N.D.Ga.2002). To-

bacco manufacturers, including Lorillard, use the data reported to MSA to monitor and detect potential fraudulent reporting by wholesale distributors and their retail customers who are participating in the manufacturer's promotional programs.

Along similar lines, Mr. Hazemi described his bookkeeping:

> There's no accounting book. It's very, very simple. Either money comes or money goes. Money goes to the bank. Money comes and then turns around and goes to the bank. Then you purchase. There is no accounting. There is no booking.

(Ex. D, at 188, 194). Mr. Hazemi did allow, however, that he could contact the suppliers that sold him Newport cigarettes-Costco and City Sales-for copies of Montrose's purchase invoices. (Ex. D, at 209-10, 212). He later admitted that he also bought Newport cigarettes from other suppliers as well: McClain, Chambers & Owen, and Flemming. (Ex. D, at 229). Lorillard's counsel specifically asked him about one more distributor, Peter Karfias, and Mr. Hazemi testified that Montrose purchased only "fourth tier" cigarettes from him, never Newports. (Ex. D, at 91-93). In fact, invoices from Mr. Karfias indicate that Montrose had actually purchased more than $60,000 worth of Newport cigarettes from him between August 12, 2003, and November 18, 2004. (2nd Decl., Ex. QQ).

Mr. Hazemi testified that he paid for these cigarettes by check on Montrose's account at Labe Bank, and kept the cancelled checks in a drawer. (Ex. D, at 213). He thought Lorillard had obtained these in the seizure. (Ex. D, at 213). On other occasions, Mubeen Hussain purchased cigarettes for Montrose and paid for them with his personal credit card; Mr. Hazemi would reimburse him with cash. (Ex. D, at 214). Mr. Hazemi testified that he had no receipts for these purchases. (Ex. D, at 216).

In the time since Mr. Hazemi's second depos-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

ition, the Montrose defendants have decided that he does not take everything to his house or discard invoices after "dumping them in a cabinet. In its response to Lorillard's previous motion, Montrose and the Hazemis maintain the Lorillard obtained the boxes of documents at the seizure. (*Def.Resp.,* at 3). Unfortunately for the Montrose defendants, the seizure occurred on July 16, 2003. Some two weeks later, on August 1, 2003, Montrose offered to produce the 10 to 12 boxes of invoices in response to Lorillard's discovery requests. (Ex. A2, Resp.3). This, despite the fact that the offer to allow the boxes to be inspected came after the cigarette and document seizure occurred on July 16, 2003. In addition, in a letter dated April 18, 2005, Montrose's counsel informed Lorillard that he had three boxes of Montrose documents including "bank statements, delivery sheets, orders, purchase invoices, and other business documents." (Second Declaration of Jeffrey Mote ("2nd Mote Decl."), Ex. BB). Montrose's purchase orders and invoices, then, seem to be a target forever in motion, if they exist at all.

### 2
### Cigarette Sales

**\*9** Lorillard also sought sales records that purportedly existed on Montrose's computer's hard drive which it used for cigarette sales reporting. ( *Combined Motion and Memorandum to Compel Discovery and Freeze Assets* (" *Pl.Mem.* "), at 3). This was necessary in order to explain PDF images on a compact disc that Montrose had produced as evidence of cigarette sales it reported to MSA in 2003. (2nd Mote Decl., ¶ 30). After repeated requests for the hard drive went unfulfilled, Lorillard subpoenaed a backup file of Montrose's computer records from Montrose's computer consultant, Osama Mouhsen, on January 12, 2005. (*Pl.Mem.,* at 3). Mr. Mouhsen had two overlapping data bases from Montrose, one covering November of 2003 through February of 2005, and one covering December of 2001 to March of 2004. (2nd Decl., Ex. II, at 78-79). At his deposition on March 21, 2005, Mr. Mouhsen explained that Mr. Hazemi had asked him to switch data bases in March of 2004,

and to create a new one that covered the period beginning in November of 2003. (Ex. II, at 78-79). He also indicated that he offered to sell Mr. Hazemi a scanning device and program for incoming inventory, but Mr. Hazemi was not interested. (Ex. II, at 80). Mr. Hazemi did, at least, use a UPC scanner dedicated to the sales of cigarettes. (Mote Decl., Ex. D, at 202-04). Once Montrose became aware of the subpoena, it agreed to produce the hard drive for inspection, and Lorillard engaged a forensics firm to image it. (*Pl.Mem.,* at 3). All this to secure discovery of sales records that one would ordinarily expect to be much easier to obtain.

According to Mr. Hazemi, he did not bother to track inventory at Montrose, he would simply looked at the shelves and take a rough guess. (Mote Decl., Ex. D, at 205-06). At any given time, Mr. Hazemi said, there were 6000 cartons of cigarettes at Montrose, 15 to 20% of which were Newport cigarettes. (Mote Decl., Ex. D, at 206). After the seizure, Mr. Hazemi said that figure was closer to 3 to 5%. (Mote Decl., Ex. D, at 207). Mr. Hazemi testified that those inventory levels would also reflect the percentages of Newport sales. (Mote Decl., Ex. D, at 207). For a more specific answer, Mr. Hazemi referred Lorillard's counsel to MSA. (Mote Decl., Ex. D, at 207-08).

### 3
### Other Discovery Efforts

Given the paucity of Montrose's records, Lorillard consulted the MSA records as Mr. Hazemi had repeatedly encouraged it to do. Those records for the year 2003 detailing inbound and outbound shipments reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases. (Ex. O). This information is certainly suspicious and, as Lorillard points out, seems to suggest that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard.

Montrose still refuses to produce financial or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

accounting records, even for the very recent past, claiming that it does not keep even the most basic records, such as balance sheets, income statements, or cash flow statements. (*Pl.Mem.,* at 3-4). According to the Montrose defendants, this is because the Hazemis work long hours and have little time for paperwork, relying instead on deposits and expenditures for income and expenses. (*Def.Resp.,* at 1). Nevertheless, it is strange-to say the least-that Mr. Hazemi, who has a masters degree in accounting from Roosevelt University (Mote Decl., Ex C. at 30), would cavalierly eschew even the simplest of business practices. Strange, unless there turns out to be an underhanded explanation for it.

## D
### Creative Tax Returns

**\*10** At his first deposition in February 2004, Mr. Hazemi testified that he had not filed a return for Montrose or himself since 1999. (Ex. C, at 133-34). He explained that he had asked for extensions every year. (Ex. C, at 134). The returns produced, then, were apparently merely drafts. On February 22, 2005, Montrose made a supplemental production of purported income tax returns for the years 1997 through1999. The 1997 return is the only one signed by an officer of Montrose; again, it would appear that the others were never filed. (Exs.I1-I7). Once again, Lorillard was left to its own devices to assemble some kind of picture of Montrose's finances.

Lorillard deposed Montrose's tax preparer, John Cherachi, on February 2, 2005. According to Mr. Cherachi, the Montrose returns for the years 2000-2003 were "draft" tax returns that had not been filed. (Ex. G, at 195, 199-200, 231). Mr. Cherachi also produced income tax return records for the Hazemis for the years 2000, 2002, and 2003 (the 2001 return was missing). (Exs.H1-H4). He prepared returns for the years 2001 through 2003 all at the same time, in May or June of 2004. (Ex. G. at 149-50). Mr. Cherachi testified that he had prepared tax returns for the Hazemis since the early 1990s, but could not recall a single instance in

which the Hazemis had not required an extension from the IRS because their records were always incomplete. (Ex. G, at 231-35). And he did not know if the Hazemis had ever actually filed these returns. (Ex. G, at 151).

During his deposition, Mr. Cherachi testified that he met with Mr. Hazemi in approximately June of 2004, and prepared summary spreadsheets (Ex. J) for Montrose's 2001-2003 income tax returns. (Ex. G, at 154-55). At that time, however, Mr. Hazemi did not provide Mr. Cherachi with any financial records or documents to prepare these spreadsheets. Instead, he sat next to him at a computer in his home and orally told him, reading from notes, what numbers to insert in the spreadsheets. (Ex. G, at 150-154). Tellingly, Mr. Cherachi testified that Mr. Hazemi requested he prepare Montrose's 2003 return as a "final" return and that he zero out the books for Montrose Wholesale on the balance sheets included in that return. (Ex. G, at 179; Ex. I7). This, as already noted, directly conflicts with evidence elsewhere in the record.

At various times since at least January 2, 2001, Montrose's principals have represented to others that Montrose was insolvent, beginning with, as already noted, the Stock Purchase Agreement. (Ex. DD, at RN 279). In February 2002, the Montrose defendants' counsel in this lawsuit, Robert Egan, represented to plaintiff's counsel in another lawsuit involving a supplier, Chambers & Owens, that both Montrose and Ray Hazemi were financially insolvent. (Ex. GG). Montrose's income tax returns from 1997 through 2003, show purported losses of more than \$2,889,350 during that period. (Exs.I1-I7). Nearly all of those losses-\$2,771,756-were reported after the Hazemis took full control of Montrose. Mr. Cherachi confirmed that the losses reported in Montrose's 2001-2003 tax returns were based on numbers Mr. Hazemi dictated to him as he sat at his computer; he never saw any corroborating financial records. (See Exs. I5-I7; Ex. G at 150-157). That is certainly not surprising, given Mr. Hazemi's "bookkeeping" or lack thereof.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

### E

### The Hazemis' Banking Records and Use of Corporate Funds

**\*11** Throughout this litigation, bank records-even the mere existence of accounts-have, like records of every other type, been a matter of some secrecy for the Hazemis and the Montrose corporation. At his second deposition, Mr. Hazemi testified that Montrose maintained its only bank account-a checking account-at Labe Bank. (Mote Decl., Ex. D, at 188, 194). He also stated that he had no personal bank account of any kind. (Mote Decl., Ex. D, at 188, 190). His wife, however, maintained an account with Citibank. (Mote Decl., Ex. D, at 189). Although Mr. Hazemi testified that the funding for that account comes from Montrose (Mote Decl., Ex. D, at 192), his wife swore in her affidavit that she has never received any money from Montrose. ( *Def.Resp.,* Ex. 8). As for his lack of any type of banking or checking account, Mr. Hazemi explained that he simply paid cash to cover his day-to-day expenses, using money from Montrose. FN10 (Mote Decl., Ex. D, at 190). The Hazemis used Sandra Hazemi's account to pay the mortgage, the utilities, grocery bills, and clothing expenses. (Mote Decl., Ex. D, at 191).

> FN10. According to the Montrose defendants, Mr. Hazemi accounts for this by declaring a "management fee" from Montrose, which is reflected in his personal tax returns. (*Def.Resp.,* at 4). As already noted, however, these returns have never been filed, and were based on figures Mr. Hazemi dictated to Mr. Cherachi which may or may not have been drawn from an actual financial record. Given Mr. Hazemi's admitted aversion to bookkeeping, it is more likely they were not.

When Montrose refused to voluntarily produce its bank records, Lorillard began to subpoena its banks including Labe Federal Bank and Village Bank and Trust. Records from Labe Federal Bank reveal that between February 2, 2002 and June 13,

2003, Mr. Hazemi wrote more than $8,779,000 in checks to "Montrose Wholesale," purportedly for cash drawn on Montrose's Labe Bank account. (Ex. L). Montrose has not produced any records identifying where these funds were transferred or how the funds were used. In their response to Lorillard's motion, the Montrose defendants explain these funds were deposited at Parkway Bank & Trust in what they call an "ancillary" account and used to purchase cigarettes from a distributor called Fleming. (*Def.Resp.,* at 5, 10). Incredibly, the Montrose defendants fault Lorillard for "distort[ing] the use of the account by ... not demonstrating any disbursements from the account." (*Id.*). It is the Montrose defendants, however, who have produced no records relating to this account; any distortion of their activities is a product of their non-compliance with discovery.

Lorillard also obtained bank records for another undisclosed account. It seems Montrose held an account at Village Bank & Trust from November 2002 until the end of July 2004, despite the fact that Mr. Hazemi testified that Montrose did all its banking at Labe Bank. (Ex. M). These records reveal more than a million dollars in transactions during that period. Thus, approximately ten million dollars ran through these two accounts that apparently slipped Mr. Hazemi's mind at his second deposition. To date, Lorillard continues to seek records relating to these accounts, including cancelled checks, without success.

Village Bank & Trust was also a source of three loans to Montrose and the Hazemis. (Exs.Nl-N3). Neither the Hazemis nor Montrose have produced records relating to these transactions. The first loan is a credit account for $85,000, for the Hazemis dated November 27, 2002, with a mortgage taken on the Hazemi's home at 650 Pleasant Lane, Lombard, Illinois. (Ex. N1). The second loan involves a $750,000 Promissory Note dated February 21, 2003. The loan agreement is referred to as a "Business Loan Agreement" and identifies Sandra Hazemi as the borrower of purchase money

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

for the property located on three lots at 4417 W. Montrose Avenue, in Chicago-the property that houses Montrose. Interestingly, Mr. Hazemi is listed as an unlimited guarantor on the loan, despite the fact that, at his second deposition, he claimed that he had no assets, aside from being the sole shareholder in Montrose. (Ex. D, at 193). He also claimed neither he nor his wife owned any property except for the family home in Lombard, Illinois, and an interest in her family's home in Canada. (Ex. D, at 197).

*12 The third loan is dated April 8, 2003 and involves a Promissory Note for $350,000 to Montrose and First National Bank of Blue Island, Trust No. 71013 as joint borrowers. (Ex. N3). Montrose has never produced nor otherwise disclosed any interests it has in property with this trust. Moreover, the address provided for First National Bank of Blue Island, Trust No. 71013, is 6630 W. Montrose Avenue-the same address as that linked to numerous businesses affiliated with the Hazemis and their relatives. Trust documents attached to the loan papers reveal that Ray Hazemi and his sister, Giti Azari, were assigned the beneficial rights in the trust on April 3, 2003, and that the trust was set up in connection with a 1999 installment contract for property that Giti Azari purchased. (Ex. N, at VBT 000117).

**F**

**Associated Businesses**

Mr. Hazemi has been similarly cryptic regarding the other businesses with which he has been, and is, affiliated. When Lorillard posed an interrogatory asking him to identity "each and every business" that he had ever been "affiliated with as an owner, shareholder, employee, officer or agent," Mr. Hazemi certified that the only businesses he has been affiliated with are Montrose Wholesale and G & D Pantry, as their respective presidents. (Ex. B2, ¶ 8). Lorillard's investigations have suggested otherwise. At his deposition, Mr. Cherachi testified that Mr. Hazemi had hired him to prepare taxes for at least three other business, S & D

Pantry, Franklin Cigarette Depot, and Malibu, Inc. (Ex.G, at 59, 62-63, 67-68). In addition, other evidence Lorillard obtained pursuant to third-party subpoenas confirmed that Mr. Hazemi neglected to mention several businesses with which he had been affiliated in one capacity or another: Harwood Heights Gas Mart (employee); S & D Pantry (employee); Malibu Inc. (president and owner); Franklin Cigarette Depot (owner and employee); and Milano Pizza (owner or manager). (Ex. CC).

Mrs. Hazemi also has certain property interests that Mr. Hazemi chose to keep secret as his deposition: 4417-4425 W. Montrose Avenue, Chicago; 6764 W. Forest Preserve Drive, Harwood Heights (Ex. N); and, of course, the aforementioned 3019 N. Rose Street property. (*Plaintiff's Emergency Motion to Freeze Assets,* Ex. F). This contradicts not only the Hazemi's recent testimony at their depositions in July and August of 2005, but even Mr. Hazemi's earlier testimony that his wife had no real property interests aside from the Hazemi's house in Lombard and a house in Canada that had been in the family for sixty years. (Ex. D at 196-197). And of course, it demonstrates that the Hazemis have no qualms about flirting with perjury to see to it that their assets remain hidden.

As is apparent from the forgoing, and from the Hazemis' efforts to secure the property where the Montrose store is located, Mr. Kakvand has a good deal of involvement with the Hazemis and their businesses. In October of 2004, he was indicted along with Ali Razvi in the Northern District of Illinois, for bank and wire fraud in connection with a scheme to defraud mortgage lenders out of more than $27 million. (Ex. KK, Case No. 04 CR 0896). According to the indictment, Kakvand would purchase run-down apartment buildings through companies he either owned or controlled-including Residential Realty Development, Inc., Infiniti Financial Corporation, Liberty Financial, and Mortgage Bankers Service Corporation-and obtain false, inflated appraisals from co-conspirators based on non-existent renovations. (Ex. KK, Case No. 04 CR

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

0896). He would then resell the properties as condo developments or apartments to shill buyers for whom he obtained and then pocketed mortgage loans. (Ex. KK, Case No. 04 CR 0896). One of the fraudulent apartment transactions identified in the indictment involves the aforementioned property at 6201-6203 S. Champlain Avenue and Mr. Kakvand's company, 6201 S. Champlain, LLC. (Ex. KK, at 4). The address for the company is the same as Montrose's address, 4419 W. Montrose Avenue. (Ex. MM).

*13 Interestingly, Mr. Kakvand purchased the Champlain property from Omni Investments, LLC, which is run by Bardan Azari, son of Giti Azari. (Ex. MM). Giti Azari was also the registered agent for the previously mentioned Kakvand company, Liberty Financial. (Ex. MM). Bardan and Bahar Azari also are linked to Liberty Financial as evidenced by the Citations to Discover Assets served on them in connection with a civil case against Kakvand, *Hoge v. Kakvand,* Cook County Case No. 95 CH 10195. (Ex. MM). Giti Azari and Bahar Azari also both worked at another of Mr. Kakvand's businesses, Mortgage Bankers Service Corporation, in 1999 through 2001, which received at least a few administrative penalties from the Illinois Office of Banks and Real Estate ("OBRE"), including a license revocation. (Ex. LL). The company also figures in several loans to Sandra Hazemi and the Azaris. (Ex. NN).

Through Illinois property records, Lorillard discovered that Bahar Azari used her connections at Mortgage Bankers Service Corporation to obtain loans to acquire properties at 5504 W Agatite Avenue and 5806 W Giddings Street in Chicago. In addition, Giti Azari approved a series of loans to Sandra Hazemi from Mortgage Bankers Service Corporation. (Ex. NN). Sandra Hazemi obtained at least two loans from that firm for her home at 650 Pleasant Lane in Lombard, Illinois. (Ex. NN). Sandra Hazemi also acquired the property at 6774 W. Forest Preserve Drive, Chicago, in 1999 from Mr. Kakvand and Residential Realty Development

with a $450,000 loan from Labe Bank. (Ex. OO, loan no. 01-12000452). Closing records show that $390,796.56 was distributed to Mr. Kakvand's Residential Realty Development, Inc. (Ex. OO, at LAB 2095). Interestingly, Giti Azari signed on behalf of MBBG, Inc. as guarantor on the Labe Bank note for Sandra Hazemi's purchase of 6774 W. Forest Preserve Drive. (Ex. OO, at LAB 2115).

## II
## THE PROPRIETY OF FREEZING ASSETS IN THIS CASE

Based on the foregoing record, Lorillard asks this court to enter an order freezing the assets of Montrose and the Hazemis under Fed.R .Civ.P. 65. A district court is not permitted to freeze a defendant's assets solely to preserve a plaintiff's right to recover damages. *Grupo Mexicano de Desarollo, S.A. v. Aliance Bond Fund,* 527 U.S. 308 (1999). The decision in *Grupo Mexicano,* however, did not concern the preliminary relief available in a suit seeking an equitable remedy. 527 U.S. at 325. Indeed, the Supreme Court made note of the fact that a restraint on assets was still available when the suit sought an equitable relief. *Id.* at 325 (*citing Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940) (upholding prejudgment asset freeze in case seeking equitable relief, including appointment of receiver to wind up corporation, rescission of contracts, and the return of disputed fund of money)). In this instance, Lorillard seeks, among other relief contemplated by the Lanham Act, a disgorgement of the Montrose defendants' profits, which is an equitable remedy. *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir.2002); *BASF Corp.,* 41 F.3d at 1095-96.[FN11] Because Lorillard seeks to recover the Montrose defendants' profits, then, an order freezing the Montrose defendants' assets is within the court's authority. In, *CSC Holdings,* for example, the court found that an asset freeze was entirely proper where the plaintiff sought remedies that including accounting and profits. As such, the court has the authority to enter an order freezing assets in cases where the plaintiff seeks an equitable remedy generally, *CSC Holdings,* 309 F.3d at 996;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

*S.E .C. v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir.2005); *Elliott v. Kiesewetter,* 98 F.3d 47, 58 (3rd Cir.1996),* and specifically, in Lanham Act cases such as this one. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok International, Ltd. v. Marnatech Enterprises,* 970 F.2d 552, 559 (9th Cir.1992). After a review of the voluminous record in this case, the court finds that a preliminary injunction freezing the Montrose defendants' assets is warranted in this case.[FN12]

> FN11. The Montrose defendants argue that Lorillard must establish a nexus between the sale of counterfeit cigarettes-specifically, five cartons that apparently have been seized-and the assets to be frozen. ( *Def.Resp.,* at 13-14). In support, they rely on two cases: *Mitsubishi International v. Cardinal Textile Sales,* 14 F.3d 1507 (11th Cir.1994); and *Rosen v. Cascade International, Inc.,* 21 F.3d 1520 (11th Cir.1994). Neither case supports the Montrose defendants' position. In *Mitsubishi,* while the Ninth Circuit did hold that "a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment," 14 F.3d at 1521, it had no occasion to consider the propriety of freezing assets to preserve a party's right to an equitable remedy. Instead, the relief at issue was the payment of a debt and money damages for fraud. The *Rosen* court held similarly, but took care to distinguish situations in which the plaintiff is seeking an award of monetary damages from those in which the plaintiff is seeking equitable relief. 21 F.3d at 1527, 1528-29. That distinction, at work here, is apparently lost on the Montrose defendants. Furthermore, to the extent that the Montrose defendants argue that the individual Hazemis' assets are out of reach, such concerns are addressed in the court's

discussion of Lorillard's "alter ego" theory.

FN12. The Montrose defendants submit, without authority, that a preliminary injunction cannot be entered without a hearing. (*Def.Resp.,* at 12.) Rule 65, however, does not make a hearing a prerequisite for ruling on a preliminary injunction. Certainly, if genuine issues of material fact are created by the response to a motion for a preliminary injunction, an evidentiary hearing is indeed required. *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1171 (7th Cir.1997). "But as in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive-he must show in other words that he has and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to issue an injunction." *Id.* Here, the Montrose defendants have made no such showing and, indeed, do not even expound upon their assertion that the court must conduct a hearing. They do not indicate what evidence they might introduce against Lorillard's motion and, given that they admit that they keep virtually no corporate or financial records, it is doubtful that any such evidence exists. *See In re Aimster Copyright Litigation,* 334 F.3d 643, 654 (7th Cir.2003) (party's own activity hampered its ability to present contrary evidence in preliminary injunction proceeding). As the court has already detailed, the record assembled in this matter is extensive. It includes two depositions' worth of Mr. Hazemi's sworn testimony, not to mention a sworn affidavit from his wife. Add these to more than a thousand pages of financial and business records and the material before the court is more than adequate to allow the court to rule on Loril-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

lard's motion without a hearing.

**\*14** A party seeking a preliminary injunction under Fed.R.Civ.P. 65 is required to demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted. *Promatek Industries, Ltd. v. Equitrac Corp.,* 300 F.3d 808, 811 (7th Cir.2002). If the moving party can satisfy these conditions, the court must then consider any irreparable harm an injunction would cause the nonmoving party. *Promatek Industries,* 300 F.3d at 811. Finally, sitting as a court of equity, the court then weighs all these factors employing a sliding-scale approach: the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor. *Promatek Industries,* 300 F.3d at 811.

**A**

**Likelihood of Success on the Merits**

In the context of a motion for a preliminary injunction in a trademark infringement claim, a likelihood of success exists if the party seeking the preliminary injunctive relief demonstrates that it has a "better than negligible" chance of succeeding on the merits of the underlying infringement claim. *Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). The record thus far assembled in this matter certainly meets this rather minimal hurdle. Indeed, on July 15, 2003, Judge Aspen entered an ex parte seizure order in which he found that Lorillard was likely to succeed on the merits in this case. Nothing has occurred since Judge Aspen made that finding that would convince the court to disturb his ruling. At that time, one of Lorillard's division managers had purchased cigarettes that had turned out to be counterfeit at the Montrose store. The seizure produced further evidence of counterfeit cigarettes. MSA records reveal Montrose had sales of promotional Newport cigarettes that far exceed its purchases, arguably suggesting that Montrose was acquiring significant volumes of Newport cigarettes from illegitimate, non-reporting sources and/or providing its

retail customers with fraudulent invoices to obtain higher rebate payments from Lorillard. In addition, at his deposition, Mr. Hazemi was less than frank about his sources of Newport cigarettes. The record satisfies the court that Lorillard has "better than negligible" chase of succeeding on the merits of its case.

For the court's purposes here, however, the likelihood of Lorillard's success in pursuing their "alter ego" theory of liability against the Hazemis is just as important as their likelihood of success on their Lanham Act claims. Under Illinois law, to succeed on this theory, Lorillard must show that: "(1) there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequity." *International Financial Services Corp. v. Chromas Technologies Canada, Inc.,* 356 F.3d 731, 736 (7th Cir.2004). Among the factors pertinent to this showing are whether there was inadequate capitalization, a failure to observe corporate formalities, an absence of corporate records, and commingling of funds. 356 F.3d at 738. Once again, the record as it stands in this case is more than adequate to demonstrate that Lorillard is likely to succeed on its "alter ego" theory.

**\*15** Corporate formalities such as meetings or corporate minutes are not a part of the Montrose defendants' operations. Courts are known to allow sole proprietors or husband-and-wife proprietors some leeway in this area, especially where they have made efforts to maintain records and keep corporate funds separate from their own. *See, e.g., Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.,* 995 F.2d 785, 788 (7th Cir.1993). Here, however, the Hazemis admittedly have made no such efforts. In addition, they are less than forthcoming about Montrose's corporate ownership structure. While Mrs. Hazemi was listed as a 50% owner in 1998, she was apparently replaced in this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

position by her husband in 1999. She was a 50% owner once again in 2003, apparently taking over half of her husband's share at that time. What is a bit more disturbing, however, is that Mrs. Hazemi has filed an affidavit in which she swears she has never been a shareholder of Montrose. (*Def.Resp.,* Ex. 8). She also swore that she has never been an officer of Montrose, yet she signed an application for the corporation's reinstatement as vice president. This obfuscation about the Hazemi's shareholder status might not be a terribly significant factor when viewed in isolation, but in this case, it must be combined with the following evidence regarding the absence of any corporate record keeping and the Hazemi's commingling of Montrose's funds with their own.

Finding an absence of corporate records can be no easier than it is in this case: the Montrose defendants trumpet their failure to keep corporate records, employing it as a shield against discovery. According to them, there are no records such as balance sheets, cash flow statements, or accounting ledgers, for Montrose. (Mote Decl., Ex. D, at 188, 194, 210-11; *Def.Resp.* at 8). The Montrose defendants claim they do not keep order forms or track inventory. (Ex. D, at 205-06; *Def.Resp.,* at 9). Instead, Montrose's sole records are cancelled checks and bank deposits. (Ex. D, at 188, 194; *Def.Resp.,* at 8). Everything, the Montrose defendants claim, is based on cancelled checks and bank deposits, including tax returns. (*Def.Resp.,* at 10). Those tax returns are prepared by Mr. Hazemi dictating numbers to Mr. Cherachi without any corroborating financial records. (Mote Decl., Ex. G, at 150-54). The last time either Montrose or Mr. Hazemi filed a tax return was 1999. (Mote Decl., Ex. C, 133-34). The Montrose defendants explain that they simply do not have the man-power to keep any semblance of traditional corporate records. (*Def.Resp.,* at 1, 8, 9-10).

This absence of records not only supports Lorillard's alter ego theory, but creates conditions that are ripe for the commingling of assets. Mr. Hazemi does not bother to maintain a personal bank account; instead, he draws cash as needed from Montrose. (Mote Decl ., Ex. D, at 190). The Montrose defendants explain that they account for this as a "management fee" on tax returns. (*Def.Resp.,* at 4). There is no evidence that the Montrose defendants kept any record of Mr. Hazemi's cash withdrawals, however, and, as just noted, the tax returns are prepared without corroborative financial data and have not been filed since 1999. Mr Hazemi testified that the money in his wife's checking account came from Montrose as well. (Ex. D, at 192). But, Mrs. Hazemi swore that she has *never* received any money from Montrose and, more specifically, that she has never been paid for working at Montrose. (*Def.Resp.,* Ex.8). Thus, there is no telling what the funds in her checking account represent. Neither Mr. nor Mrs. Hazemi, then, seem to acknowledge that Montrose is a separate entity from themselves when it comes to Montrose's money.

**\*16** Montrose's banking practices allow for the commingling of assets as well. During discovery, Mr. Hazemi maintained that Montrose did all its banking at one bank. (Mote Decl., Ex. D, at 188, 194). Lorillard's own efforts revealed that Montrose had accounts at two other banks as well. The Montrose defendants suggest that there was nothing secretive about these accounts; they did not disclose them because they were merely "ancillary" accounts. (*Def.Resp.,* at 10). They claim to have used one "ancillary" account to deposit over $8 million from checks Montrose wrote to itself on its Labe Bank account, but have produced no records of that activity. (*Def.Resp.,* at 5). Lorillard's third-party discovery efforts have revealed the other "ancillary" account was home to approximately $1 million in transactions over a twenty-month period. (Mote Decl., Ex. M). Nearly $10 million is quite a bit of activity for a couple of undisclosed, ancillary accounts, especially when the Hazemis feel free to help themselves to cash from Montrose without any accounting or records of their withdrawals. And, the fact that Mrs. Hazemi owns the property that houses Montrose, after a long and serpentine series

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

of transactions involving an individual under indictment for defrauding mortgage lenders, does not escape the court's attention. Her ownership is made all the more suspicious by the fact that Mr. Hazemi testified his wife owned no property other than the family home in Lombard and an interest in her family's home in Canada. And, as has recently been made clear by the revelations regarding the 3019 N. Rose St. property, this is not the only property ownership the Hazemis have covered up.

The evidence Lorillard has advanced in this matter demonstrates that, with respect to Montrose, the Hazemis have disregarded corporate formalities, have kept no corporate records, and have treated corporate funds as their own. Judge Aspen has already found that there is a likelihood that Lorillard will succeed on it Lanham Act claims, and there have been no further developments that would counsel a revision of that opinion. Based the record in this matter, the court finds that Lorillard has not only established a likelihood of success on the merits of its Lanham Act claims, but as to it "alter ego" theory as well.

**B**

**Inadequate Remedy at Law and Irreparable Harm**

Next, Lorillard must show that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued. *FoodComm Intern. v. Barry,* 328 F.3d 300, 304 (7th Cir.2003). "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *FoodCom Intern.,* 328 F.3d at 304. In this case, the Lanham Act provides Lorillard with the equitable remedy of recovering the Montrose defendants' profits. In such cases, courts have generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible. *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995); *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir.1992).

**\*17** The evidence discussed above demonstrates that the Hazemis are hardly circumspect about segregating their assets from those of Montrose. Corporate financial records are non-existent, bank accounts go undisclosed. Clearly, the remedy of disgorgement of profits will be less than inadequate if the Hazemis continue to treat the Montrose coffers as their own and relieve Montrose of its corporate assets. In addition, especially given the Hazemis' disregard for corporate bookkeeping, the profits at issue in this case might become all but untraceable, if that is not already the case.

Finally, it is clearly not beyond the Hazemis to lie about the very ownership of assets. They have done so recently and repeatedly. It is not unusual, in a Lanham Act case, for a court to freeze assets where there is evidence that the defendants "may hide their allegedly ill-gotten funds if their assets are not frozen." *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 563 (9th Cir.1992). This is not a case where there is a mere threat of the Hazemis hiding their assets; Lorillard has demonstrated that they are already actively doing so, and attempting to cover their trail with more deception. It is the Hazemis that have brought this case to this brink. They have seen to it that there is no other way to preserve the *status quo* but an asset freeze. Accordingly, the court finds that Lorillard has established that it has no adequate remedy at law and will suffer irreparable hardship without a freeze of the Hazemis' assets.

**C**

**Balance of Harms to the Respective Parties**

In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose. *FoodComm Intern.,* 328 F.3d at 305. In so doing, the court bears in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *AM General Corp. v. Daimler-Chrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)
**(Cite as: 2005 WL 3115892 (N.D.Ill.))**

In this case, there is no doubt that the Hazemis will suffer harm if their assets are frozen. But it is a harm they have brought upon themselves with their tactics of deception and underhandedness. Just how to quantify that is a difficult question because the Hazemis have not addressed the issue. But this much is certain: the Hazemis have had a rather long string of chances to end their pattern of deception in this litigation: the court has given them the benefit of the doubt time and again. They have chosen to blatantly lie, in depositions and in open court. The balance of harms, by far, favors the protection of Lorillard's rights by the issuance of an order freezing the Hazemis' assets.

The court also notes that, in balancing the harms to the parties, the greater a movant's chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor. *FoodComm Intern.,* 328 F.3d at 303. As the court's foregoing discussion reveals, Lorillard has made a rather strong showing that it will succeed on the merits of this case. Accordingly, the court grants Lorillard's motion for a preliminary injunction freezing the Hazemis' assets in this case. Lorillard shall submit a draft order freezing the Hazemis' assets and detailing the plan for the court's approval.

**\*18** Recognizing that the freezing of assets could work a hardship on the Hazemis, the order should make provisions for withdrawal of living expenses, and for the payment of expenses related to legitimate business operations. If the Hazemis comply with the order, and submit the necessary proof to the Court, no undue hardship need be felt by defendants as a result of the asset freeze. Moreover, the Court is free to modify or dissolve the preliminary injunction if warranted by developments in this case subsequent to the noticing of this appeal.

Although the court accepts Lorillard's arguments regarding the necessity of an asset freeze, it cannot accept the argument that no bond is necessary in this case. Under Federal Rule of Civil Procedure 65(c):

[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The rule, as the Seventh Circuit has stated, makes security mandatory. *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994). While it is clearly within the court's discretion to fix the amount of the bond, *Id.,* the parties here have provided the court with no evidence, or even discussion, of what would constitute an appropriate amount. As such, the parties must file memoranda on this issue along with supporting documentation, in order that the court may determine a reasonable amount for security in this instance. *See, e.g. Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883, 887 (7th Cir.2000); *Gateway Eastern Ry. Co.,* 35 F.3d at 1142.

### III
### CONCLUSION

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion-and emergency motion-for a preliminary injunction freezing the defendants' assets be granted. It is further recommended that the plaintiff be ordered to file a draft order for the court's approval, and the parties be ordered to file memoranda on the appropriate amount of the bond as per this report and recommendation.

N.D.Ill.,2005.
Lorillard Tobacco Co. v. Montrose Wholesale Candies
Not Reported in F.Supp.2d, 2005 WL 3115892 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Donald VANCE and Nathan Ertel, Plaintiffs,
v.
Donald RUMSFELD, United States of America and
Unidentified Agents, Defendants.

No. 06 C 6964.
Dec. 21, 2007.

Michael I. Kanovitz, Arthur R. Loevy, Gayle M.
Horn, Jonathan I. Loevy, Loevy & Loevy, Chicago,
IL, for Plaintiffs.

James R Whitman, Washington, DC, Samuel B.
Cole, United States Attorney's Office, Chicago, IL,
for Defendants.

MEMORANDUM OPINION AND ORDER

ARLANDER KEYS, United States Magistrate
Judge.

**\*1** Currently before the Court is Plaintiffs' Mo-
tion for Limited Discovery. Defendant United
States argues that Plaintiffs are not entitled to the
requested discovery and that the Court lacks juris-
diction to compel the production. For the reasons
set forth below, Plaintiffs' Motion is granted in part,
and denied in part.

**BACKGROUND FACTS**[FN1]

FN1. The Background Facts were taken
from the allegations in Plaintiffs' Amended
Complaint, which, at this stage of the pro-
ceedings and for purposes of the present
Motion, the Court will accept as true.

Plaintiffs Donald Vance and Nathan Ertel, both
American citizens, traveled to Iraq in 2004 to work
for the Sandi Group, which provides security ser-

vices for the Unites States State Department, non-
governmental organizations ("NGO's"), and com-
mercial and media firms operating in Iraq. Dissatis-
fied with their working conditions, Plaintiffs
resigned from Sandi and returned to the United
States.

In 2005, Shield Group Security ("SGS"), an-
other private security firm operating in Iraq, re-
cruited Plaintiffs, separately, to join the firm. Both
Mr. Vance and Mr. Ertel accepted positions with
SGS, and returned to Iraq in late 2005.

SGS maintained its offices in a gated com-
munity in the "Red Zone" in Baghdad, Iraq.
Plaintiffs resided in this gated community, which
was patrolled by armed guards, and was essentially
a neighborhood populated by native Iraqis, SGS
employees, and other expatriates employed by
private firms doing business in Iraq.

Plaintiffs allege that, while working with SGS,
they observed suspicious and potentially illegal
activity. Specifically, Plaintiffs claim that they wit-
nessed SGS agents making payments to Iraqi
sheikhs, in an attempt (they believed) to gain an ad-
vantage from these influential Iraqis. Concerned
about the legality of SGS's actions, Mr. Vance pur-
portedly contacted the Federal Bureau of Investiga-
tion ("FBI") during a visit to Chicago. Mr. Vance
was put in contact with FBI agent Travis Carlisle,
who arranged for Mr. Vance to continue to report
on SGS's suspicious activity in Iraq. Mr. Vance
agreed to do so, and reported to Agent Carlisle
daily.

Agent Carlisle subsequently put Mr. Vance in
contact with Maya Dietz, a United States govern-
ment official working in Iraq. Ms. Dietz asked Mr.
Vance to copy SGS's computer documents and to
forward them to her; Mr. Vance agreed.

Mr. Ertel apparently shared Mr. Vance's con-
cerns, and subsequently became aware of Mr.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

Vance's communications with the FBI. Mr. Ertel agreed to assist Mr. Vance in reporting to Agent Carlisle, and the two also began communicating their concerns to Deborah Nagel and Douglas Treadwell, two U.S. government officials working in Iraq.

Plaintiffs reported to Agent Carlisle and other U.S. officials that SGS Vice President Jeff Smith [FN2] routinely sold arms, ammunition, night vision technology and infrared targeting systems throughout Iraq. Mr. Smith was well-connected politically, and had a direct relationship with both General George Casey and Iraqi President Jalal Talabani. Plaintiffs also informed both Agent Carlisle and Ms. Nagel that Laith Al-Khudairi, a well-connected employee in the detainee operations division of the United States State Department, conducted suspicious meetings at the SGS compound [FN3].

> FN2. Although Mr. Smith did not serve as SGS's Vice President at all relevant times, he was consistently "high-up in the chain of command at SGS." Amen. Compl. at ¶ 65. Plaintiffs also reported on a number of other SGS employees, including their supervisor, Mr. Josef Trimpert, who was involved in an illegal "Beer for Bullets" scheme.

> FN3. Plaintiffs also informed on a number of other SGS-Affiliated members of the Al-Khudairi family. Plaintiffs imply that, in addition to SGS, all of the individuals that they informed on would have a motive to have them arrested. Plaintiffs also find it suspicious that none of these individuals were detained and questioned in a manner similar to Plaintiffs, despite the incriminating information Plaintiffs presented about them to the FBI and other officials.

**\*2** Plaintiffs found the government officials within Iraq to be unreceptive to their concerns, informing Plaintiffs that there was little the local officials could do to address the problem. Discouraged with the local officials' responses, Plaintiffs shared most of the information they gathered only with Agent Carlisle [FN4].

> FN4. Plaintiffs' Amended Complaint also alleges that, once these government officials working in Iraq realized they were being left out of the loop, they chose to retaliate by having Plaintiffs arrested and interrogated.

Plaintiffs allege that SGS began to question their loyalty to the firm. SGS's suspicions escalated, and on April 14, 2006, armed SGS agents confiscated Plaintiffs' access cards, effectively trapping Plaintiffs in the "Red Zone" within the SGS compound. Plaintiffs contacted Ms. Nagel and Mr. Treadwell, who advised Plaintiffs to barricade themselves in a secure room until U.S. forces could rescue them. Plaintiffs complied and were removed from the SGS compound by U.S. forces.

Plaintiffs were then escorted to the U.S. Embassy, where military personnel seized all of their personal property, including their laptop computers, cellular phones, and cameras. Plaintiffs claim that they were then separated and questioned by an FBI agent and two individuals from United States Air Force Intelligence. Plaintiffs revealed the suspicious activity that they had observed while employed by SGS, and their communications with the FBI. Plaintiffs informed their interrogators that information contained on their seized computers would support their statements. Following the interviews, Plaintiffs were escorted to trailers, where they were permitted to sleep for two to three hours.

Their rest was short-lived. Several armed guards arrested Plaintiffs, handcuffing and blindfolding the men, and escorted them into a humvee. Plaintiffs were taken to Camp Prosperity, a U.S. military compound in Baghdad, where they were placed in a cage, strip searched, and fingerprinted. They were then taken to separate cells, and held in solitary confinement. Plaintiffs were labeled "security internees" affiliated with SGS, and were

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY Page 3

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)

**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

suspected of supplying weapons to insurgents. Plaintiffs were allegedly informed that this information was sufficient, according to the policies enacted by Defendant Donald Rumsfeld, for the indefinite, incommunicado detention of Plaintiffs, without due process or access to an attorney.

Two days later, Plaintiffs were again shackled and blindfolded, and then transported to Camp Cropper, another U.S. military compound in Baghdad. At Camp Cropper, Plaintiffs were repeatedly interrogated and subjected to physically and mentally coercive tactics by military personnel, who refused to identify themselves. These unidentified individuals also denied Plaintiffs' repeated requests for an attorney.

On April 20, 2006, Plaintiffs received letters from the Detainee Status Board, indicating that a proceeding would be held on April 23rd, to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." The letter explained that Plaintiffs did not have the right to legal counsel at that proceeding, and that they could only present evidence and witnesses who were reasonably available at Camp Cropper. On April 22, 2006, Plaintiffs received a notice that the Detainee Status Board had determined that they were "security internees," and that they had the right to appeal the determination to Camp Cropper officials. Plaintiffs appealed, and requested that they be allowed to testify on the other's behalf, and that their seized personal property be admitted as evidence of their innocent civilian status.

**\*3** On April 26, 2006, Plaintiffs appeared before the Board. However, they were not permitted to testify on the others' behalf, nor were they provided with the evidence that they had requested. In addition, the Board refused to allow Plaintiffs to see the evidence against them or to confront any adverse witnesses. Nevertheless, on May 17, 2006, Major General John Gardner authorized Mr. Ertel's release-18 days after the Board officially acknowledged that he was an innocent civilian. Mr. Vance's detention continued for an additional two

months, where he was continually interrogated. Major General Gardner authorized Mr. Vance's release on July 13, 2006, but he was not permitted to leave Camp Cropper until July 20, 2006. Neither Plaintiff was ever charged with any crime.

Plaintiffs filed suit against Donald Rumsfeld on December 18, 2006, alleging that Mr. Rumsfeld should be held accountable for constitutional violations that occurred in Iraq at the hands of unidentified agents of the United States, as well as for the allegedly unconstitutional practices and policies enacted by Defendant Rumsfeld, which led to Plaintiffs' arrest and confinement.

On December 22, 2006, Plaintiff Vance filed a Motion for Leave to Serve Expedited Third Party Discovery on the United States. The United States filed a Motion in Opposition and a "Statement of Interest" on January 11, 2007. Plaintiffs and the United States appeared before Judge Milton I. Shadur, on January 16, 2007. At the hearing, Judge Shadur questioned the advisability of permitting the requested discovery directed at the United States, in the absence of Defendant Rumsfeld. However, Judge Shadur stated that it would be beneficial for the United States to facilitate the Plaintiffs in their quest to determine the identities of the unknown individuals responsible for their arrest, interrogation, mistreatment, and detention.

The United States agreed that the discovery of just the identities of other potential defendants would be less objectionable than allowing discovery against the United States on substantive issues, but argued that Plaintiffs had failed to demonstrate sufficient need that the information be obtained through expedited discovery. Judge Shadur, however, was sympathetic to Plaintiffs' concern that they likely would be faced with a statute of limitations defense if discovery were not expedited. In addition, Judge Shadur acknowledged the comparative difficulty Plaintiffs would face in attempting to secure the identities of the unknown defendants, most, if not all of whom, were stationed in Baghdad. Judge Shadur further stated that he did

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)

**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

suspected of supplying weapons to insurgents. Plaintiffs were allegedly informed that this information was sufficient, according to the policies enacted by Defendant Donald Rumsfeld, for the indefinite, incommunicado detention of Plaintiffs, without due process or access to an attorney.

Two days later, Plaintiffs were again shackled and blindfolded, and then transported to Camp Cropper, another U.S. military compound in Baghdad. At Camp Cropper, Plaintiffs were repeatedly interrogated and subjected to physically and mentally coercive tactics by military personnel, who refused to identify themselves. These unidentified individuals also denied Plaintiffs' repeated requests for an attorney.

On April 20, 2006, Plaintiffs received letters from the Detainee Status Board, indicating that a proceeding would be held on April 23rd, to determine their legal status as "enemy combatants," "security internees," or "innocent civilians." The letter explained that Plaintiffs did not have the right to legal counsel at that proceeding, and that they could only present evidence and witnesses who were reasonably available at Camp Cropper. On April 22, 2006, Plaintiffs received a notice that the Detainee Status Board had determined that they were "security internees," and that they had the right to appeal the determination to Camp Cropper officials. Plaintiffs appealed, and requested that they be allowed to testify on the other's behalf, and that their seized personal property be admitted as evidence of their innocent civilian status.

**\*3** On April 26, 2006, Plaintiffs appeared before the Board. However, they were not permitted to testify on the others' behalf, nor were they provided with the evidence that they had requested. In addition, the Board refused to allow Plaintiffs to see the evidence against them or to confront any adverse witnesses. Nevertheless, on May 17, 2006, Major General John Gardner authorized Mr. Ertel's release-18 days after the Board officially acknowledged that he was an innocent civilian. Mr. Vance's detention continued for an additional two

months, where he was continually interrogated. Major General Gardner authorized Mr. Vance's release on July 13, 2006, but he was not permitted to leave Camp Cropper until July 20, 2006. Neither Plaintiff was ever charged with any crime.

Plaintiffs filed suit against Donald Rumsfeld on December 18, 2006, alleging that Mr. Rumsfeld should be held accountable for constitutional violations that occurred in Iraq at the hands of unidentified agents of the United States, as well as for the allegedly unconstitutional practices and policies enacted by Defendant Rumsfeld, which led to Plaintiffs' arrest and confinement.

On December 22, 2006, Plaintiff Vance filed a Motion for Leave to Serve Expedited Third Party Discovery on the United States. The United States filed a Motion in Opposition and a "Statement of Interest" on January 11, 2007. Plaintiffs and the United States appeared before Judge Milton I. Shadur, on January 16, 2007. At the hearing, Judge Shadur questioned the advisability of permitting the requested discovery directed at the United States, in the absence of Defendant Rumsfeld. However, Judge Shadur stated that it would be beneficial for the United States to facilitate the Plaintiffs in their quest to determine the identities of the unknown individuals responsible for their arrest, interrogation, mistreatment, and detention.

The United States agreed that the discovery of just the identities of other potential defendants would be less objectionable than allowing discovery against the United States on substantive issues, but argued that Plaintiffs had failed to demonstrate sufficient need that the information be obtained through expedited discovery. Judge Shadur, however, was sympathetic to Plaintiffs' concern that they likely would be faced with a statute of limitations defense if discovery were not expedited. In addition, Judge Shadur acknowledged the comparative difficulty Plaintiffs would face in attempting to secure the identities of the unknown defendants, most, if not all of whom, were stationed in Baghdad. Judge Shadur further stated that he did

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

not believe "a reasonable inquiry on the part of the government would find any difficulty in identifying persons that the plaintiff is not in a position to identify." 1/16/2007 Hearing Transcript at p. 8. As such, Judge Shadur ordered the United States to "go back and inquire into the availability of such information through the kinds of sources that are available to you." *Id.* at p. 11,

**\*4** The parties returned to Judge Shadur's courtroom ten days later, on January 26, 2007. The United States reported that initial conversations with officials at the State Department did not reveal any individuals who might be responsive to the relevant portion of Plaintiffs' discovery requests, but that the officials would require more time for investigation. Counsel then stated that the Department of Defense had conducted some interviews, and that "they are more likely to have people who are responsive to those categories, but they are going to require more time as well. Based on my conversation with them I would say that it would take at least 60 days in order to conduct that investigation and come to a determination as to who is not responsive to those requests." 1/26/2007 hearing transcript at p. 3.

Although the United States initially agreed to turn over the identities of potential defendants on a rolling basis, counsel later balked, explaining that the United States would not disclose the information absent a competent court order to do so. Counsel reiterated the difficulty that even the United States government would face in attempting to conduct the requested discovery in an active war zone.

On February 12, 2007, Plaintiffs amended their Complaint, naming the United States of America as an additional Defendant. In Count XV of their Amended Complaint, Plaintiff asked that the Court, pursuant to the Administrative Procedure Act ("APA") 5 U.S.C § , 701 *et seq.* (West 2007), order the United States to return personal property that Plaintiffs allege military personnel confiscated from them when they were arrested in Iraq.

On February 21, 2007, the case was reassigned to Judge Wayne R. Andersen. Defendants subsequently filed a Motion for Transfer of Venue, which Judge Andersen denied on September 19, 2007. Plaintiffs, who had agreed to stay their discovery requests until Judge Andersen issued his ruling on Defendants' Motion for Transfer of Venue, refiled their discovery Motion on October 1, 2007. Judge Andersen referred all discovery matters, including Plaintiff's Motion for Limited Discovery, to this Court.

The parties appeared before the Court on October 5, 2007. At the hearing, the United States argued that Plaintiffs' APA claim was moot, because the United States Department of Defense ("DoD") had already returned all of the property that it could reasonably locate, and that the Plaintiffs were barred from seeking any other form of redress against military personnel under the APA. In response, Plaintiffs stated that they had reason to believe that agencies in addition to the DoD may have had possession of their property; thus the DoD's bald assertion that it did not have any additional property belonging to Plaintiffs was, at best, inconclusive. Plaintiffs also raised the possibility that employees of private government contractors might be among the "unidentified defendants" acting in concert with military personnel-and thus, were potentially outside of the scope of the protections afforded by the military authority exception-further undermining Defendant's argument that Plaintiffs' claims were moot.

## DISCUSSION

**\*5** Plaintiffs seek leave to discover the identities of the individuals responsible for their arrest, detention, and mistreatment in Iraq. Plaintiffs note that the facilities where they were held are "sterilized" facilities, meaning that all of the personnel are anonymous to the detainees. As such, Plaintiffs claim, they do not have effective means of identifying and naming these unknown defendants.

To that end, Plaintiffs have sought discovery

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

from the United States since January of 2007, when the United States informed Judge Shadur and Plaintiffs that, despite the inherent difficulties involved in conducting such discovery, the United States' investigation into the identity of additional defendants would be complete in approximately 60 days. Obviously, more than 60 days has passed since the United States made this assertion, and the United States has never denied that it possesses much of the information that Plaintiff seeks. Yet, the United States has staunchly refused to divulge the fruits of its investigation.

In its Response, the United States argues that Plaintiffs are not entitled to the information and that their Motion must be denied, because: 1) Plaintiffs have not demonstrated that expedited discovery of any matters is appropriate in this case; 2) this Court lacks jurisdiction to order discovery against the United States; 3) granting Plaintiffs' Motion would raise serious Separation of Powers concerns; and 4) Plaintiffs' discovery requests are futile. The Court will address each of the government's arguments in turn.

**I. Expedited Discovery is Appropriate**

The United States notes that, despite the fact that Plaintiffs have been seeking this information for approximately one year, Plaintiffs' Motion is actually one for expedited discovery, because the parties have not conferred pursuant to Fed.R.Civ.P. 26(f). The government asserts that Plaintiffs bear the burden of demonstrating that expediting discovery is necessary, and that any harm to Plaintiffs in not expediting discovery outweighs the prejudice to the responding party if discovery is expedited. *See generally, Merrill Lynch Pierce, Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D. 618, 623 (N.D.Ill.2000).

Plaintiffs argue that delaying discovery would cause them irreparable harm, because of the looming statue of limitations deadline on their *Bivens'* claims. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The parties dispute whether Illinois' two-year stat-

ute of limitations (which will expire in approximately April of 2008) should apply to Plaintiffs' *Bivens* claims or the District of Columbia's three-year limitations period should-or at least-could have controlled. *Compare Delgado-Brunet v. Clar,* 93 F.3d 339, 342 (7th Cir.1996) (noting that courts applying Illinois law impose a two year statute of limitations on such claims) *with Carney v. American Univ.,* 151 F.3d 1090, 1096 (D.C.Cir.1998) (finding that D.C. Circuit law imposes a three year statute of limitations on *Bivens'* claims). Contrary to the government's assertion [FN5], the question of which jurisdictions' law applies depends not upon the forum in which Plaintiffs filed suit, but upon Judge Andersen's resolution of the choice of law issues [FN6]. It is conceivable that such a ruling would be issued after Illinois' two-year statute of limitations period has passed, forcing Plaintiffs to shoulder the risk that the district court's decision could effectively foreclose their ability to seek redress from the unknown defendants.

> FN5. The United States insists that Plaintiffs have effectively manufactured the purported prejudice by choosing to file in a forum with a shorter limitations period.

> FN6. Of course, the forum in which the suit is filed is a factor in the choice of law analysis.

**\*6** The government counters that conducting expedited discovery in a warzone outweighs any such concerns. The Court disagrees. There is no apparent end in sight to the hostilities in Iraq, and the United States is powerless to waive a statute of limitations defense on behalf of the unknown defendants. In addition, the government represented to Judge Shadur, almost one year ago, that it had already begun its investigation into the identities of the unknown defendants, and that it could conclude that investigation within about 60 days. The United States has never denied that it possesses some if not all of the information that Plaintiffs seek. Therefore, the Court finds that potential harm to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

Plaintiffs by delaying discovery outweighs any resulting prejudice to the United States.

## II. This Court has Jurisdiction to Compel Discovery

The United States bluntly asserts that this Court lacks jurisdiction to order the government to produce discovery for the reasons explained in its recently filed Motion to Dismiss Rule 12(b) (1). Of course, this Court has the authority to dispose of the arguments raised in Defendant's Motion to Dismiss. *See generally, Thomas v. Arn,* 474 U.S. 140, 141-42, 106 S.Ct. 466, 88 L.Ed.2d 435 (U.S.1985); *see also, Brown v. City of Chicago,* No. 98-7949, 2001 WL 1064259, at *1 (N.D.Ill. Sept.10, 2001) (noting that magistrate judges lack jurisdiction to rule on the City's motion to bifurcate trial, where the referral only encompassed discovery disputes.) But the Court need not resolve the United States' Motion to Dismiss to properly evaluate Plaintiffs' present Motion; an analysis of relevant law makes clear that the government's filing of a Motion to Dismiss-even one challenging the district court's jurisdiction-does not strip the Court of the authority to order appropriate discovery.

The resolution of a question concerning "jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,* ---U.S. ----, ----, 127 S.Ct. 1184, 1192, 167 L.Ed.2d 15 (U.S.2007) quoting *Intec USA, LCC v. Engels,* 467 F.3d 1038, 1041 (7th Cir.2006). In the instant case, it is clear that this discovery Motion is collateral to a resolution of the merits.

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). "Where issues arise as to jurisdiction, or venue, discovery is available to ascertain facts bearing on such issues." *Id.* A district court has wide latitude in determining whether to grant a party's request for discovery and

such decisions are reviewed for an abuse of discretion. *Doty v. Illinois Cent. R.R. Co.,* 162 F.3d 460, 461 (7th Cir.1998).

Courts have taken a rational approach to discovery requests made in advance of a determination regarding jurisdiction. Courts have generally found it unnecessary for a district court to order discovery or hold a hearing on a motion to dismiss for lack of subject matter jurisdiction where the facts are straightforward and the law is not complex. *See Hay v. Indiana State Bd. of Tax Com'rs,* 312 F.3d 876, 882 (7th Cir.2002) ("Because of the minimal procedural requirements for 'plain, speedy and efficient' set forth by the Supreme Court in *Rosewell,* the district court could make a determination of adequacy based on the information before it, including by reviewing the applicable statutes establishing the procedures for tax assessment review. Consequently, it was not an abuse of discretion for the district court to grant the motion to dismiss without allowing the landowners to conduct discovery"); *Cook v. Providence Hosp.,* 820 F.2d 176, 178 (6th Cir.1987) (finding that no hearing is required on a motion to dismiss where the facts are relatively simple, substantially uncontroverted, and the law is not complex.)

**\*7** However, where additional discovery would assist the court in resolving the jurisdictional issues, discovery is appropriate. *Ignatiev v. United States,* 238 F.3d 464, 467 (D.C.Cir.2001) (rejecting the district court's determination that the plaintiffs requested discovery was nothing more than a fishing expedition, and finding that the district court erred in granting the motion to dismiss for lack of subject matter jurisdiction without permitting discovery on the jurisdictional question.); *Rosner v. United States,* 231 F.Supp.2d 1202, 1218 (S.D.Fla.2002) (permitting the plaintiffs to conduct discovery to determine whether the government's actions were non-military in nature, thus precluding the application of the APA's "military authority" exception, prior to resolving defendant's motion to dismiss.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY

Page 7

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)

**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

In the instant case, Plaintiffs have argued that the APA military authority exception may not apply to certain unidentified defendants, if those defendants were not military personnel[FN7]. Absent the requested discovery, however, it would be impossible for Plaintiffs to support such an argument. A full and fair analysis of the government's Motion to Dismiss hinges on the disclosure of the identities and status of the unknown defendants. Similarly, the district court's resolution of the Defendant Rumsfeld's qualified immunity argument would benefit from information about the types of defendants involved in the abuses claimed by Plaintiffs.

> FN7. Plaintiffs also argue that the exception may not apply, because the government's failure to return the Plaintiffs' personal property is not military in nature.

The United States counters that discovery is not warranted in any event, because Plaintiffs' sole claim against the government-their claim for the return of personal property seized in Iraq-is moot. The United States bases its mootness argument on: 1) the affidavit of Lt. David Melson, averring that the government has conducted a search of any and all places where the property would have been seized, stored or located; 2) Evidence/Property Custody documents ("Property Documents") that purportedly demonstrate the chain of custody of the property in question; and 3) the fact that the government has made arrangements to return that property belonging to Plaintiffs that it was able to locate[FN8].

> FN8. Plaintiffs note that the only item that the United States has found is Mr. Vance's laptop, and that the government has offered no explanation as to why it was able to locate this one item and no others.

Plaintiffs first attack Lt. Melson's affidavit, noting that Lt. Melson claims to have contacted only the Joint Personnel Recovery Center ("JPRC"), the Evidence Custodian for the Military Policy Criminal Investigative Division ("CID") and

the 494th MP Battalion in his search for Plaintiffs' property. Lt. Melson did not contact any other government agencies or military departments, despite the fact that FOIA documents that Mr. Vance received demonstrate that the Naval Criminal Investigative Service ("NCIS") had control over at least some of Mr. Vance's property, including his thumb drives and cell phone. As such, the investigation described in Lt. Melson's affidavit appears on its face to be incomplete.

Plaintiffs next highlight numerous inconsistencies in the Property Documents proffered by the government. For example, the Property Documents include a property receipt for Mr. Vance that does not match the receipt that Mr. Vance has in his possession. Mr. Vance claims that these discrepancies raise doubts about the authenticity and reliability of the property receipts.

**\*8** Finally, Plaintiffs argue that their APA claim relates to the United States' failure to return property that was seized more than 18 months ago. Because Plaintiffs' challenge against any governmental actors would be limited to the government's failure to return their property, and not to the seizure itself, the act is not military in nature, and, therefore, falls outside of the scope of the military authority exception. *See Jaffe v. United St ates,* 592 F.2d 712, 720 (3rd Cir.1979) (ruling that the plaintiff's APA claim for failure to warn about the medical risks associated with observing a nuclear test in Nevada did not fall within the military authority exception, as the challenged conduct did not occur in the field nor in time of war.) Indeed, Plaintiffs do not know if their property remains in military custody, with the State Department, the FBI, the CIA, or a host of other agencies. As such, Plaintiffs argue, their claim is neither clearly barred[FN9] by the military authority exception nor moot, and discovery is appropriate.

> FN9. The Court is not ruling on the validity of Plaintiffs' arguments, merely noting the existence of reasonable opposition to the government's position.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

The Court agrees that the evidence proffered by the government is far from conclusive on the issue of mootness. Moreover, even if the government's evidence was not flawed, this evidence would not moot Plaintiffs' claims if the district court determines that the government's conduct was not military in nature, or if the unidentified actors were private governmental contractors-like many of the allegedly politically-connected individuals who were the subject of Plaintiffs reports to Agent Carlisle-who are not shielded by the APA's military authority exception. As such, it is difficult to see how the district court can resolve Defendants' argument that the military authority exception bars Plaintiffs' APA claim, without a more clear understanding of the individuals involved in the complained of abuses.

In conclusion, the Court finds that the issue of jurisdiction in this case is complex and fact intensive. Analysis of the issues raised in Defendants' Motion to Dismiss would only benefit from appropriately tailored discovery. As such, the Court rejects the United States' claim that the arguments raised in its Motion to Dismiss strip the Court of the power to compel discovery.

### III. Tailored Discovery Would Not Violate Separation of Powers Concerns.

The United States next argues that separation-of-powers concerns dictate against granting Plaintiffs' Motion for discovery. The government notes that the purpose of the APA's "military authority" exception is to prevent federal courts from interfering in military strategy, decision-making, and actions occurring in "combat zones or in preparation for, or in the aftermath of, battle." Def.'s Resp. at 6, citing *Doe v. Sullivan,* 938 F.2d 1370, 1380 (D.C.Cir.1991) (finding that the plaintiff's challenge to a rule published by the FDA was not a military matter.) Notably, the district court has not ruled that the military authority exception to the APA applies in this case, and Plaintiffs have offered colorable arguments that the exception does not apply.

**\*9** Nevertheless, the government argues, it is impossible to divorce this case from the realities of an ongoing war in Iraq. Agreed. However, the cases cited by the government are tangential, at best, to the issue of whether the requested discovery in this case is advisable or even permissible. For example, the government cites to *Chappel v. Wallace* *FN10*, where the Court discussed the unique distinction between military and civilian life:

> FN10. Similarly, *Alhassan v. Hagee,* 424 F.3d 518, 525 (7th Cir.2005) concludes that it would be inappropriate for courts to review whether a soldier's evidence of his opposition to war was sufficient to establish that he was a conscientious objector whether his objection to war was based on religious concerns, and whether his beliefs were deeply felt. Responsibility for making such determinations rest with the military, not the courts.

[J]udges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. 462 U.S. 296, 301, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting *Orloff v. Willoughby,* 345 U.S. 83, 93-94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953)).

But the case at bar involves charges filed by civilians-not soldiers attempting to avoid the jurisdiction of a military tribunal. And caselaw teaches that citizens have the right to sue the government for abuses that occurred during wartime, and that the judiciary retains the authority to adjudicate those suits. In *Hamdi v. Rumsfeld,* the United States Su-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

preme Court rejected "the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances. Indeed, the position that the courts must forgo any examination of the individual case and focus exclusively on the legality of the broader detention scheme cannot be mandated by any reasonable view of separation of powers, as this approach serves only to *condense* power into a single branch of government. We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." 542 U.S. 507, 535-36, 124 S.Ct. 263, 265 (2004).

The *Hamdi* Court's decision demonstrates that, not only do citizens detained during wartime have the right to seek redress in the courts, but that the courts have the authority to require the United States to afford those litigants certain processes, despite the exigencies of war. Mr. Hamdi, a United States citizen, was taken into custody in Afghanistan, after he was allegedly found supporting Taliban soldiers against the United States. Mr. Hamdi was subsequently detained, indefinitely, in a military facility in the United States, and he filed a petition for habeas corpus. Mr. Hamdi argued that he was denied a meaningful and timely hearing on the issue of whether he was an enemy combatant, and that his extra-judicial detention, which began and ended with the submission of an affidavit based on third-party hearsay, violated his rights under the Fifth and Fourteenth Amendments. *Id,* 542 U.S. at 524-25,

**\*10** The government argued that "[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decision-making in connection with an ongoing conflict" ought to eliminate entirely any individual process, restricting the courts to investigating only whether the broader detention scheme itself is legal. *Id.* at 527. A majority of the Supreme Court disagreed, and found instead that the "tension ... between the autonomy that the Government asserts

is necessary .. and the process that a citizen contends he is due before he is deprived of a constitutional right," should be resolved by balancing the plaintiff's constitutional rights against the government's separation of power and wartime concerns. *Id., citing Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The Court balanced Mr. Hamdi's assertion that he should have been afforded full due process rights, as the risk of an erroneous deprivation of liberty absent such protections was unacceptably high, with the government's claim that enemy combatants-even if they are citizens-are entitled to only minimal process. The government highlighted the "practical difficulties that would accompany a system of trial-like process" because "military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried in the rubble of war." 542 U.S. at 531-32, 124 S.Ct. at 2648.

The Court concluded that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the government's assertions before a neutral tribunal. 542 U.S. at 533, 124 S.Ct. at 2648. In so ruling, the Court found it "unlikely that this basic process will have the dire impact on the central functions of warmaking that the Government forecasts." *Id* at 534, 124 S.Ct. at 2639. The Court further noted that such a process would meddle little into the waging of war, inquiring only into the appropriateness of certain detentions, explaining:

While we accord the greatest respect and consideration to the judgments of military authorities in matters relating to the actual prosecution of a war, and recognize that the scope of that discretion necessarily is wide, it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY
Page 10

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)

**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

mandated roles of reviewing and resolving claims like those presented here.

542 U.S. at 535, 124 S.Ct. at 1249-50.

Obviously, the issue presented here is distinguishable; the United States has not contested the feasibility of asserting an APA claim against it, but has instead challenged the validity of Plaintiffs' claims, and its obligation to produce discovery as a result. With the exception of the APA's military authority exception-the applicability of which Plaintiffs contest-the government has not argued that Congress has authorized the suspension of APA suits against it. Nevertheless, *Hamdi* is instructive in assisting this Court's balancing of Plaintiffs' need for information relevant to this litigation against the undeniable hurdles of gathering discovery in Iraq during wartime.

**\*11** As discussed above, if the United States does not provide Plaintiffs with the identities of the unknown defendants, there is a very real possibility that the applicable statute of limitations will prevent Plaintiffs from ever seeking redress from potentially liable individuals. In addition, the Court is not persuaded that gathering this information will require the United States to "go out into the field to interview" soldiers "some of whom may be conducting combat operations." Def.'s Resp. at p. 7. Plaintiffs very specifically identified the dates and locations of their detention. It strains credulity to believe that the government and/or military does not have in place procedures for documenting individuals working in those facilities at specific times.

Moreover, the United States has already been ordered by Judge Shadur to begin such an investigation, and has stated that such an investigation would be completed in approximately March of 2007. The government does not deny that it already has the information that Plaintiffs seek, it simply refuses to divulge the information. As such, it is not clear the extent to which the separation of powers concerns cited by the United States are even implicated FN11.

FN11. The United States complains that the requested discovery is inappropriate, because military personnel on active duty in Iraq should not be required to defend against a lawsuit, half way around the world. Plaintiffs correctly point out that such concerns can be appropriately addressed after the unknown defendants have been identified. For example, Congress has enacted the Servicemembers' Civil Relief Act, 50 U.S.C. app. § 501 *et seq.,* which allows courts to stay litigation against' defendants in the active duty military.

Finally, while the Court is sensitive to the extreme challenges presented by the ongoing hostilities in Iraq, the Court cannot accept the practical consequences of the United States' position-that the existence of a war so diminishes the authority of the judiciary that it must suspend the normal routes of discovery, based on little more than the United States' own assessment of its opponent's position. It is the resulting concentration of power in the executive branch that would offend separation of powers concerns.

The Court concludes that Plaintiffs should be afforded that basic discovery necessary to enable Plaintiffs to avoid a potential statute of limitations' defense. As such, the United States shall produce to Plaintiffs the identities of the unknown defendants within 30 days of the entry of this Opinion.

**IV. Potential Qualified Immunity Arguments are Insufficient to Defeat Plaintiffs' Discovery Request.**

The United States asserts that requiring it to undertake discovery in a war zone is inappropriate for the additional reason that Plaintiffs' claims against the unidentified defendants will be futile. The United States confidently asserts that any and all claims against both known and unknown defendants will be dismissed on qualified immunity grounds, and that caselaw dictates that any order compelling discovery should await a ruling on the district court's determination of the Defendants'

FOR EDUCATIONAL USE ONLY

Page 11

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)
**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

qualified immunity arguments.

Many courts have noted the "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). While *Harlow* and its progeny sought to protect government officials who were likely entitled to immunity from broad reaching discovery, the Supreme Court has acknowledged that "limited discovery may sometimes be necessary" before a court can resolve the issue of qualified immunity. *CrawfordEl v. Britton,* 523 U.S. 574, 593 n. 14, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also, Fairley v. Fermaint* 482 F.3d 897, 900 (7th Cir.2007) (noting that "qualified immunity gives the defendant a right not only to prevail but also to avoid entanglement in the litigation-sometimes dubbed a 'right not to be tried,' this entitlement includes a right to avoid discovery", but only if matters are "sufficiently clear" at the outset of the suit.)

**\*12** In the instant case, it is impossible to determine whether the unknown defendants can raise a colorable claim for qualified immunity, precisely because they-and their positions either within the government, military, or the private sector-are unknown. The only Defendant to have thus far filed a claim for qualified immunity is Defendant Rumsfeld. While Defendant Rumsfeld might present a viable argument [FN12] that he should not be required to engage in discovery until his claim for immunity is resolved, Plaintiffs are not seeking discovery from Defendant Rumsfeld. Plaintiffs are seeking the identities of the unknown defendants from the United States, and the United States did not raise a claim for qualified immunity in its Response to Plaintiffs' Motion or in its Motion to Dismiss.

FN12. Of course, Plaintiffs challenge the viability of Defendant Rumsfeld's qualified immunity claim, noting that an American citizen's right to be free from involuntary confinement without due process, even

while living abroad, was well established at the time they were detained. *Citing Hamdi,* 542 U.S. at 533.

The government's position is simply untenable. There is no statutory or caselaw support for the proposition that a court should delay discovery based on the United States' bald representation that unknown defendants will be immune from suit. Nor do the allegations in Plaintiffs' Amended Complaint compel a conclusion that the unknown defendants are necessarily military employees entitled to immunity. *See* Fed. R, Civ. P. 15(a)(2) (noting that courts should "freely give leave" to allow plaintiffs to amend their complaints "when justice so requires.") Plaintiffs' allegations are consistent with theories advanced by counsel in court, that private government contractors may have been acting in concert with the military in orchestrating Plaintiffs' arrests. Only additional discovery will reveal if the government's predictions are accurate. Therefore, the Court rejects the United States' argument that the issue of qualified immunity prevents the Court from proceeding on Plaintiffs' discovery Motion.

In addition, Plaintiffs' unopposed request for leave to serve subpoenas on SBC Global for email correspondence and on Orascom for relevant cell phone records is granted.

**CONCLUSION**

The present Motion seeks to discover the identities of those individuals responsible for Plaintiffs' arrest and detention in Iraq. Almost one year ago, the United States represented to Judge Shadur that it could obtain this information within 60 days, and the government has never denied that it possesses information responsive to Plaintiffs' request. In refusing to produce such information, the government has raised a dubious challenge to the court's jurisdiction, speculated as to the viability of potential defenses that might be asserted by presently unknown defendants, decided that its assessment of the weakness of Plaintiffs' claims should excuse the government's participation in discovery, and argued that separation-of-powers concerns counsel against

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FOR EDUCATIONAL USE ONLY

Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)

**(Cite as: 2007 WL 4557812 (N.D.Ill.))**

the court performing its judicial duties, in favor of concentrating discretion and power within the executive branch.

The Court does not presume to foresee the ultimate validity of the claims and defenses raised in this lawsuit. But the Court is convinced that it has both the authority and the obligation to order the United States to discover and produce to Plaintiffs the identities of the individuals responsible for Plaintiffs' arrests, detention, and mistreatment in Iraq.

**\*13** Therefore, the Court grants Plaintiffs' Motion to the extent that it seeks the identities of unknown defendants responsible for their arrest, detention, and mistreatment while at Camps Prosperity and Cropper in Iraq. The Court denies Plaintiffs' Motion to the extent that it seeks all documents concerning Plaintiffs, as this evidence does not implicate the statute of limitations concerns that informed this Court's decision. Similarly, the Court denies Plaintiffs' Motion to the extent that it asks the government to identify all persons who issued and or signed any policy or order that relates to the topics listed in six broad categories, even if such policy and/or order was of general applicability and not specific to Plaintiffs' case.

Therefore, Plaintiffs' Motion to identify the unknown defendants is Granted, Plaintiff's Motion for leave to serve subpoenas on SBC Global and Orascom is Granted, but Plaintiffs' Motion for all additional discovery is Denied, without prejudice.

N.D.Ill.,2007.
Vance v. Rumsfeld
Not Reported in F.Supp.2d, 2007 WL 4557812 (N.D.Ill.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

OAKLEY, INC. )
)
)
Plaintiff, )
)
v. )
)
DOES 1 - 100 d/b/a the aliases identified on )
Schedule "A", )
)
Defendants. )
)
)
_____ )

Case No. 12-cv-9864

**Judge Robert M. Dow, Jr.**

**Magistrate Judge Jeffrey Cole**

### SEALED ORDER

THIS CAUSE being before the Court on Plaintiff Oakley, Inc.'s ("Plaintiff" or "Oakley")

*Ex Parte* Motion for entry of a Temporary Restraining Order, Domain Name Transfer Order,

Asset Restraining Order, Expedited Discovery Order and Order to allow Service by Electronic

Mail and Electronic Publication (the "Ex Parte Motion") against defendants identified in

Schedule A to the Complaint and attached hereto (the "Defendants") and using at least the

Defendant Domain Names and the Online Marketplace Accounts identified in Schedule A to the

Complaint (the "Defendant Internet Stores"), and this Court having heard the evidence before it

hereby GRANTS Plaintiff's Ex Parte Motion in its entirety and orders that:

1.  Defendants, their officers, agents, servants, employees, attorneys, confederates, and all

    persons acting for, with, by, through, under or in active concert with them be temporarily

    enjoined and restrained from:

    a.  using the OAKLEY Trademarks or any reproductions, counterfeit copies or colorable

        imitations thereof in any manner in connection with the distribution, advertising,

1

offering for sale, or sale of any product that is not a genuine Oakley branded product or not authorized by Oakley to be sold in connection with the OAKLEY Trademarks;

b. passing off, inducing, or enabling others to sell or pass off any product as a genuine OAKLEY branded product or any other product produced by Oakley, that is not Oakley's or not produced under the authorization, control or supervision of Oakley and approved by Oakley for sale under the OAKLEY Trademarks;

c. committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Oakley, or sponsored or approved by, or otherwise connected with Oakley;

d. further infringing the OAKLEY Trademarks and damaging Oakley's goodwill;

e. otherwise competing unfairly with Oakley in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Oakley, nor authorized by Oakley to be sold or offered for sale, and which bear any of the OAKLEY Trademarks or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit Oakley products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product bearing the OAKLEY Trademarks or any reproductions, counterfeit copies or colorable

imitations thereof that is not a genuine Oakley branded product or not authorized by Oakley to be sold in connection with the OAKLEY Trademarks.

2. The domain name registries for the Defendant Domain Names, namely, VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within two (2) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Oakley's selection until further ordered by this Court, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to a registrar of Oakley's selection until further ordered by this Court.

3. Those in privity with Defendants and those with notice of the injunction, including any online marketplace such as iOffer, Internet search engines, web hosts, domain name registrars and domain name registries that are provided with notice of the injunction, shall immediately cease facilitating access to any and all websites and accounts through which Defendants engage in the sale of counterfeit and infringing goods using the OAKLEY Trademarks.

4. Discovery herein by Oakley may continue by providing actual notice, pursuant to subpoena, e-mail or otherwise, of this Order to any of the following:

   a. Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them;

   b. any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, or other merchant account providers, payment providers, third party payment processors, credit card associations

3

(e.g., MasterCard and VISA), which receive payments or hold assets on Defendants' behalf; or

c. any third party service providers, including without limitation the online B2B selling platforms including iOffer, Internet service providers, backend service providers, web designers, sponsored search engine or ad-word providers, shippers, domain name registrars and domain name registries who have provided services for Defendants.

5. Any third party providing services in connection with any of the Defendant Internet Stores or other websites operated by Defendants, including, without limitation, Internet Service Providers ("ISP"), back-end service providers, web designers, sponsored search engine or ad-word providers, banks, merchant account providers, including PayPal, third party processors and other payment processing service providers, shippers, domain name registrars and domain name registries (collectively, "Third Party Providers") shall, within five (5) business days after receipt of such notice, provide to Oakley copies of all documents and records in such person's or entity's possession or control relating to:

a. The identities and addresses of Defendants, their agents, servants, employees, confederates, attorneys, and any persons acting in concert or participation with them and the locations and identities of Defendants' operations, including, without limitation, identifying information associated with Defendants' websites, Defendant Domain Names and financial accounts;

b. Defendants' websites;

c. The Defendant Domain Names or any domain name registered by Defendants; and

d. Any financial accounts owned or controlled by Defendants, including their agents, servants, employees, confederates, attorneys, and any persons acting in concert or

4

participation with them, including such accounts residing with or under the control of any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, Western Union, or other merchant account providers, payment providers, third party processors, and credit card associations (e.g., MasterCard and VISA).

6.    Defendants and any persons in active concert or participation with them shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

7.    Any banks, savings and loan associations, payment processors or other financial institutions, including, without limitation, PayPal, for any Defendant or any of Defendants' websites, shall immediately locate all accounts held by or connected with Defendants or Defendants' websites and any such accounts shall be temporarily restrained and enjoined from transferring or disposing of any money or other of Defendants' assets until further ordered by this Court.

8.    Oakley may provide notice of these proceedings to Defendants, including notice of the preliminary injunction hearing and service of process pursuant to Fed.R.Civ.P 4(f)(3), by electronically publishing a link to the Complaint, this Order and other relevant documents on a website to which the Defendant Domain Names which are transferred to Oakley's control will redirect, and by sending an e-mail to the e-mail addresses identified in Schedule A to Oakley's Complaint that includes a link to said website. The combination of providing notice via electronic publication and e-mail, along with any notice that Defendants receive from domain name registrars and payment processors, shall constitute

notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and afford them the opportunity to present their objections.

9.     Schedule A and Exhibits 1 and 2 attached to the Declaration of Adrian Punderson shall remain sealed until further ordered by this Court.

10.    Oakley shall deposit with the Court Ten Thousand dollars ($10,000.00) as security, which amount was determined adequate for the payment of such damages as any person may be entitled to recover as a result of a wrongful restraint hereunder.

11.    Any Defendants that are subject to this Order may appear and move to dissolve or modify the Order on two days' notice to Oakley or on shorter notice as set by this Court.

12.    This Temporary Restraining Order without notice is entered at _____ A.M. on this ___ day of December, 2012 and shall remain in effect for (14) fourteen days.

_____

U.S. District Court Judge Robert M. Dow, Jr.